**DWYER et al. v. TRACEY.**

**No. 49 C 593.**

United States District Court
N. D. Illinois, E. D.

Feb. 2, 1954.

Martin J. McNally, Chicago, Ill., for plaintiffs.

Dent, Hampton & Dolten, Chicago, Ill., for defendant.

PERRY, District Judge.

Plaintiffs are the trustees in bankruptcy for Majestic Radio and Television Corporation incorporated under the laws of the State of Delaware. The defendant, a resident of Illinois, was a director of Majestic from March 31, 1941 until February 6, 1948, when a voluntary petition was filed by Majestic under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. The defendant became president of Majestic on May 27, 1942, and continued in that office until after the filing of the Chapter XI proceedings.

One of the directors of Majestic on March 31, 1941, who continued as a director as well as an officer of the corporation until after February 6, 1948, was Curtis Franklin of New York. Franklin was also an officer and director of Automatic Products Corporation and of numerous other corporations including the British Type Investors, Inc. In 1942, Franklin made arrangements for the defendant Tracey to become a member of the Board of Directors of Automatic Products Corporation.

Edward V. Otis, a resident of New York, was another director of Majestic whose name prominently appears in the evidence adduced in the trial of this case. He was a director from January 17, 1942, to May 8, 1946, and was continually active in the affairs of Majestic. He also was a director and officer of Automatic Products Corporation, Allied International Investors Corporation and British Type Investors, Inc. being president of said corporations.

The plaintiff's complaint charges that the defendant for his own gain and profit violated the duties and obligations to the debtor corporation which the law imposed upon him as a fiduciary. Four causes of action are alleged in the several counts of the complaint. 1) The plaintiff seeks to recover from the defendant the profits which he realized from the alleged illegal cancellation of his first employment contract and from the option from the debtor corporation as well as salaries in excess of $10,000 annually and bonuses which he was paid under the third employment contract. 2) The plaintiff seeks damages which arose from the alleged shifting by defendant of his stock options to three management heads to the debtor corporation. 3) The plaintiff seeks to recover from defendant the profits which he realized from his participation and activity in a partnership enterprise during his employment by the debtor, which enterprise is alleged to have been in competition with the debtor. 4) The plaintiff also seeks to recover from the defendant the amount of money paid to the children of James J. Walker out of corporate funds of Majestic Records, Inc., a wholly subsidiary of the Debtor corporation.

I. It is the view of this court that the evidence amply supports the allegations of the first Count. The testimony establishes the fact that on March 24, 1941, the defendant entered into a written contract with the debtor Majestic Radio and Television Corporation whereby he agreed, among other things to devote all his time and abilities exclusively to the debtor corporation for a period of five years until May 31, 1946, at a fixed annual salary of $10,000. Simultaneously with the execution of this employment contract, the defendant entered into a written agreement with Allied International Investing Corporation, Automatic Products Corporation and Allen B. Dumont Laboratories, Inc., whereby these corporations granted to the defendant an option to purchase

from them a total of 350,000 shares of common stock of the debtor at an average price of $1.50 per share. The defendant was granted no option whatsoever by the debtor to purchase shares of its stock by virtue of the provisions of his employment contract or otherwise. On March 31, 1941, at a meeting of the Board of Directors of the debtor corporation, the defendant was duly elected both a member of and chairman of the Board of Directors, and his employment contract was duly approved and ratified by the Board.

During the summer of 1941, the defendant entered into negotiations with a Canadian corporation to become its president and general manager on a part time basis. He announced these activities to the Board of the debtor at a meeting held on July 12, 1941, at which time he expressed a desire to continue his affiliation with the debtor corporation. It should be noted that the defendant entered into these negotiations in Canada in spite of and notwithstanding the contractual provisions which gave the debtor corporation the defendant's exclusive services.

At the next meeting of the Board on August 21, 1941, after considerable negotiations by the defendant with Curtis Franklin, a resolution was adopted whereby the defendant was granted an option to terminate his existing contract of employment after 90 days, provided that notice of said termination was served upon the debtor corporation not less than 30 days prior to November 20, 1941. The minutes of the meeting, conducted by the defendant in his capacity as chairman of the Board, state that the sole consideration for this option was the defendant's assumption of one-third of Automatic Products Corporation's existing guarantee of the $30,000. bank loan to the debtor. These minutes revealed that the Board granted this option "so that he would be in a position to negotiate a new contract of employment, which would permit him to devote a portion of his time to the affairs of Rogers-Majestic Ltd. and a portion of

his time to the affairs of Majestic Radio and Television Corporation". The defendant gave no consideration to the debtor for the option to terminate his contract of employment with the debtor.

The evidence does not show that the defendant ever served a thirty day notice of termination upon the debtor as provided in the Board's resolution of August 21, 1941, whereby the defendant was granted the option to terminate. Nevertheless, the minutes of the Board meeting of November 24, 1941, report that Curtis Franklin, as secretary of the Board, stated that the management and employment contract between the debtor corporation and the defendant had been terminated on November 20, 1941, pursuant to the agreement made by the Board with the defendant. The evidence does not disclose any corporate agreement to this effect. It does tend to show that the defendant was negotiating privately with Franklin to the point that they reached an agreement as to the terms of the second employment contract and the second option agreement. This agreement was presented to the Board of Directors of the debtor corporation on November 24, 1941, at which time the Board unanimously adopted a resolution authorizing its execution. Parenthetically, the Court advises that the existence of a thirty day notice of termination would not in any manner alter the ultimate conclusion of the Court.

According to this second agreement, the defendant was to receive the same annual salary of $10,000. but was required to devote only nine days in each consecutive four weeks of his time and attention to the service of the debtor. He was granted thereby an option from debtor to purchase 100,000 shares of common stock at $1 per share with the provision that he would not offer any said shares to the public.

The evidence is clear that, at this time, the obligation of the Allied, Automatic and Dumont Corporations under the aforementioned option to the defendant was reduced from 350,000 shares to 200,000 shares. The average price, how-

ever, on the balance of their obligation to them was raised from $1.50 per share to $2.25 per share. No consideration was given to the debtor by defendant or any other person or corporation for this second contract with its option agreement. The evidence clearly shows that the approval of the cancellation of the first contract of employment by the directors, who represented Allied, Automatic and Dumont corporations, which constituted the majority of the stockholders in the debtor, was motivated and induced primarily by the reduction in the number of shares under their option to the defendant.

During the latter part of 1942, the defendant and Curtis Franklin again began to discuss still another new employment contract for the defendant. At a meeting on December 1, 1942, the Board at the instance of the defendant and Franklin, adopted a resolution which approved a new employment contract for the defendant. This agreement provided that defendant was to devote his time and attention exclusively to the debtor at a fixed salary of $20,000 to May 31, 1943, and thereafter at a fixed annual salary of $25,000 to May 31, 1946. No consideration was paid to the debtor for this new contract.

Eventually, the defendant exercised his stock option paying the debtor $100,-000. The total difference between this sum and the market value of the debtor's stock on the date of the exercise of the option amounted to approximately $313,-497.50. The defendant eventually sold this stock at a net profit of approximately $273,062.50.

The total salary received by the defendant in excess of the provisions in the contracts of March 24, 1941, was $59,-290.80.

The officers and directors of a corporation are trustees for the stockholders. This is a fiduciary relationship which imposes upon the officer or the director the duty and responsibility of constantly exercising the utmost good faith in the management of corporate affairs. All actions and dealings must be performed by them with a view to promote the corporate interest and not their personal interest. Their dealings with the corporation are subject to rigorous scrutiny where any of their contracts or engagements with the corporation are challenged the burden is on the director not only to prove the good faith of the transactions but also to demonstrate its inherent fairness from the view point of the corporation and those interested therein. These basis legal principles are well settled generally and they prevail in the State of Delaware according to whose laws the transactions in question may necessarily be judged.

The plaintiff contends, and the defendant concedes, that the legality of the cancellation for his first employment contract represents the crux of the claim in the first count of this action. If the cancellation of that contract was invalid, the contract remained in effect, and all subsequent agreements were null and void.

All evidence has been considered carefully in the light of the aforementioned legal principles. It is the view of this Court that the defendant's dealings, which finally culminated in the cancellation of the first contract, thereby clearing the way for the execution of the second do not satisfy the requirements of law or equity. It must be remembered that in July 1941 when the defendant advised the Board of his Canadian negotiations, and in August 1941 when he was granted the option to terminate, the defendant was not standing before the Board in any inferior capacity. He was aware of the fact that the sole consideration supporting the option to terminate was his assumption of one-third of Automatic's guarantee on the debtor. He cannot deny that this benefit went solely to Automatic; the debtor received nothing. Both Automatic, one of the majority stockholders, and the defendant gained an advantage at the expense of the debtor corporation. The defendant, by virtue of his duties as a fiduciary, was bound to prevent such dealings at this point especially since he was to ultimate-

ly benefit from them. This was not done. On the contrary, he acted affirmatively to bring the matter to a successful conclusion in November 1941. The Court refers specifically to the defendant's private discussions with Curtis Franklin when they reached an agreement as to the terms of the second contract of employment and second option agreement, which received Board approval at the meeting of November 24, 1941. Furthermore, he did not see fit to comply with the specific proviso of the option to terminate relating to a thirty day notice. He was aware of the primary concern of the directors, representing the Allied, Automatic and Dumont interests, when they approved the cancellation of the first contract and the execution of the second. It was not any benefit which might accrue to the debtor corporation. One certainly should not regard the defendant's continued service as such benefit. The debtor was already entitled to it under the first contract. It was the reduction in the obligation of the Allied, Automatic and Dumont corporations under their stock options to the defendant. Once again, the consideration went not to the debtor corporation but to the three corporate majority stockholders. They were able to retrieve a valuable asset. As early as July 1941, the management of the debtor corporation was aware of the fact that its prospects of acquiring government defense contracts were excellent. The fact that the Allied, Automatic and Dumont corporations attached considerable value to the debtor's common stock is apparent from their own quotation in their revised option to the defendant. They raised their price from $1.50 per share to $2.25 per share. Nevertheless, the Board allowed only $1 per share to the debtor corporation when it was burdened with the option for 100,-000 shares. A person with the ability and experience of the defendant should have recognized the obvious conflict in the interests of the directors, who were representing the Allied, Automatic and Dumont interests. The record is clear that they were acting as directors of the debtor corporation but they were protecting and promoting their own interest and not that of the debtor corporation. Here again, the defendant had a striking opportunity to exercise his duty as a fiduciary to serve the interests of the debtor corporation. This he failed to do. On the contrary, he chose to accept the benefits under the so-called cancellation and the second contract. He was aware of the circumstances, which surrounded these dealings. The inherent unfairness to the debtor corporation of the entire arrangement should have been obvious to him because it is apparent on its face. Over a period of eighteen months, the defendant and several of the directors led the debtor corporation down a route which served to enhance their personal interests to the detriment and prejudice of the minority stockholders and the creditors. First of all, the defendant's negotiations with the Canadian interests within a few months of the first contract, in the face of its provision for exclusive services, are not the best evidence of the defendant's worthiness of intentions, particularly when he intended to remain with the debtor. Thereupon followed the series of transactions which were previously outlined. By December 1942, the debtor was returned exactly to the same position which it enjoyed on March 24, 1941, at a considerably higher cost to the debtor corporation. The debtor realized nothing except that it was burdened with an option and that it was deprived of the defendant's exclusive services for a year. The benefits went solely to the defendant personally and to the Allied, Automatic and Dumont corporations.

■■ In accordance with the foregoing discussion, it is the view of this Court that the events leading up to the termination of the first contract and the execution of the second were of such nature as to render the termination and the second contract illegal. Only the first contract remained effective. The defendant, by virtue of both his affirmative acts and his acquiescence in the actions of certain other directors with full knowledge of the circumstances and con-

flicting personal interests prompting such actions, committed a serious breach of his fiduciary duties as a trustee and should not be allowed to retain any resultant profits. The plaintiff is entitled to the requested relief.

2. The second count of the complaint alleges that the defendant shifted from himself personally to the debtor corporation his obligations under stock options he had given to Casagrande, Foster and Freese, employees whom the defendant hired for the debtor to fill executive positions. The plaintiff seeks recovery of $157,755.25, which represents the difference between the market value of the stock when the options were exercised and the options prices paid to Majestic for such stock.

The evidence shows that the defendant induced Casagrande to become an employee in 1941. Freese and Foster were induced by the defendant to take employment in 1942. In consideration of their agreeing to accept this employment the defendant gave to each of them an option to purchase from him personally 20,000 shares of the debtor's common stock at an average of $1.50 per share. Sometime during the middle of April, 1943, the defendant had a discussion with Franklin relative to the assumption of these option obligations by the debtor. At its meeting of April 21, 1943, the Board upon the recommendation of Franklin adopted a resolution whereby Casagrande, Freese and Foster were granted options to purchase from the debtor 20,000 shares of common stock, each, at an average price of $1.83 per share. On June 23, 1943, the price under the option to Casagrande was reduced to $1.50 per share. No consideration was ever paid to the debtor corporation for either the assumption of the defendant's obligations under the options or the reduction in the price under the option to Casagrande. It must be borne in mind that the Board action did not serve to give these three individuals additional options. Actually the debtor through this resolution assumed the defendant's obligation under his option and he was released.

Eventually, these options were exercised and the debtor received a total of $103,332 for 60,000 shares of common stock when, in fact, the cash market value of the shares on the dates the options were exercised totalled $261,087.25.

The record is clear on the one vital point in this count. The debtor received nothing out of this transaction other than the obligation to eventually deliver 60,000 shares of its common stock to its three employees. It was originally the defendant's personal obligation. It is obvious that had the debtor not assumed this obligation under the option, the defendant would be left to fulfill this obligation to deliver this stock at a price considerably lower than the market value. The debtor's resultant loss then was the defendant's gain. An officer or director is a fiduciary and cannot use his position for personal gain. This principle is applicable here when the debtor was bound to deliver a substantial block of stock at a loss because the defendant had burdened the debtor with his personal obligation. The plaintiff is entitled to recovery.

3. The defendant's first contract of March 24, 1941, contained the following provision: "Said Tracey is employed as General Manager for the Company, with the duties usually appertaining thereto, and in such capacity shall devote his entire time and attention and his best abilities exclusively to the service of the Company * * * Said Tracey shall not, during the period of his employment, directly or indirectly, engage in any similar activities for any other person, firm or corporation and shall not be interested, financially or otherwise, directly or indirectly, in any person, firm or corporation engaged in any activities competing with those of the company; provided, however, that not to exceed five per cent (5%) in aggregate amount of the investments of said Tracey may be in securities listed on the New York Stock Exchange, of such persons, firms or corporations."

The defendant admits that he was financially interested in a partnership known as the Reeve's Sound Laboratories, which was engaged in the production of crystals. This occurred during the latter part of 1942 and during 1943. He admits that he realized a profit of $70,710.

■ The Court has considered the evidence and is of the view that the Reeve's operation was in competition with the debtor corporation. The Board of the debtor expressed this same view in their minutes of June 23, 1943.

The defendant contends that he is not liable. In doing so, he appeals to the traditional principle of law that a corporate officer and director is not precluded from engaging in a similar business so long as he acts in good faith. He further emphasizes the fact that the plaintiff has shown no actual damage to the debtor. He further points to the fact that the Board was advised as to these activities and the members gave their approval. This occurred long after the invalid cancellation of the first contract.

■ The defendant cites a standard of behavior which is not applicable in the instant case. The first contract, which is the only controlling contract, set the standard whereby the defendant was barred from any similar or competing activities. Apparently, the parties appreciated the rigidity of this standard because the second and third contracts modified it by allowing such activity with approval of the Board. The first contract remained in effect. It was never validly cancelled and its terms were never modified. The defendant as a fiduciary was bound to act in accordance with this contractural standard. Any activity in violation of it constituted a breach of trust and he held the profits as trustee for the debtor corporation.

One must note that the production of crystals was the most profitable venture for the debtor. The debtor could have used more business because the defendant in his letter of March 6, 1943, to the Navy, admitted that the debtor was 200% ahead of schedule and could take on more work. This situation, coupled with the fact that the debtor was reorganized and was striving to gain a foothold and the rigid prohibition of the first contract, imposed upon the defendant a duty which he failed to discharge by engaging in the Reeves operation. The plaintiff is entitled to recover.

James J. Walker was president of Majestic Records, Inc., a wholly owned subsidiary of the debtor, from March 1945 to November 1946, at an annual salary of $36,000. He died in 1946. Following Walker's death and on December 5, 1946, the defendant voted for the adoption of a resolution to pay two years' salary to Walker's children, namely $72,000, or such lesser amount as the Board might thereafter determine. On January 22, 1947, a substitute resolution was adopted by the Board providing specifically for the payment of $13,000 per month to Walker's two children. At the time this resolution was adopted by the defendant and the other directors, Majestic Records, Inc.'s financial position was dangerous. The minutes of the meeting at which this last resolution was adopted reveal that the corporation was then in arrears in the payment of excise taxes due the Collector of Internal Revenue in the amount of $341,377.21. The sum of $11,250 was paid to Walker's children under these resolutions.

The defendant does not dispute the payment of the monies or the increasingly dangerous financial position of the subsidiary. He emphasizes the worthiness of the cause to justify his action.

■ Majestic Records, Inc. was not a charitable corporation. The money was not expended for a corporate purpose. There is no doubt that, under the law, this constituted an unlawful gift of corporate funds to the Walker children. The defendant, having joined in this action, violated his fiduciary duty to the corporation, and thereby rendered himself liable for the amount given.

■ The Court has given careful consideration to the evidence as well as

the legal arguments of counsel relative to the defense of laches. It is of the view that the defendant has not sustained this defense. Among many things, the Court is impressed with the fact that the corporation, under the leadership of the defendant, did not make a *complete* disclosure to its shareholders regarding the corporate operations, which are the subject of this lawsuit. It was not until the Trustees in Bankruptcy entered the scene that complete discovery could be made. They were diligent and timely in the filing of this suit.