**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Leon I. ROSS, Defendant-Appellant,**
**and**

**Ross & Company, Ltd., and Central Trading, Inc., Defendants.**

**No. 85, Docket 30612.**

United States Court of Appeals
Second Circuit.

Argued Oct. 20, 1966.

Decided Nov. 14, 1966.

Irwin B. Robins, New York City (Robert M. Morgenthau, U. S. Atty., for the S. D. of New York, Grant B. Hering, Asst. U. S. Atty., and Harold C. Wilkenfeld, Atty., Dept. of Justice, on the brief), for appellee.

Frank R. Cohen, New York City (Farber, Cohen & Diamond, New York City, on the brief), for appellants.

Before WATERMAN, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge:

This is an appeal from a judgment in favor of the United States in an action to recover income taxes owed by appellant for the years 1956–1959 on account of undistributed foreign personal holding company income realized by two foreign personal holding companies of

which he was a shareholder. We affirm the determination of the lower court.

Section 551 of the Internal Revenue Code of 1954 [1] (26 U.S.C. § 551) requires shareholders in foreign personal holding companies to include in gross income the undistributed foreign personal holding company income of such companies. Section 552(a) defines a foreign personal holding company as a foreign corporation (1) more than 50 percent of the stock of which is owned directly or indirectly by not more than five United States citizens and (2) at least 60 percent (50 percent after the first year) of the income of which is foreign personal holding company income. Under Section 543 (a) foreign personal holding company income consists of dividends, interest, royalties, annuities and "[e]xcept in the case of regular dealers in stock or securities, gains from the sale or exchange of stock or securities."

It is conceded that the two defendant corporations, Ross & Company, Limited and Central Trading, Inc., were foreign corporations and that Ross, an American citizen, owned all of the stock of Ross & Company which in turn owned all of the stock of Central Trading, Inc. The only issue raised by appellant is whether the two corporations realized foreign personal holding company income during the years in question. Appellant contends (1) that Central Trading, which the Government claims had gains from sales and exchanges of stock and securities during the years 1956–1958, was a regular dealer in stock or securities and (2) that that part of the income of Central Trading which is the subject of the Government's claim was received as payment for services and was not therefore within the definition of foreign personal holding company income. The Government also claims that Ross & Company received interest payments from Central Trading during 1959. Appellant contends that Central Trading's payments were for interest on certain loans made by third parties to Central Trading and

that Ross & Company was a mere conduit for the payments.

In 1953 Ross, then residing in Nassau, Bahamas, organized Ross & Company, Ltd., to act as a broker and dealer and to manage companies. At all times pertinent to the present case Ross owned all the stock of the Company and was its chief officer. In 1956 Ross organized Central Trading, Inc., a Liberian corporation. Ross & Company owned all the stock of Central Trading.

Early in 1956 Ross became involved in a plan to seek an oil concession from the Venezuelan government. Along with certain others he arranged for the formation of a Venezuelan corporation called Venezuelan Leaseholds, C.A., which was to submit a bid for the oil concession. Central Trading acquired all of the stock of Leaseholds C.A.

A few days after the organization of Leaseholds C.A., Ross caused to be formed a Liberian corporation called Venezuelan Leaseholds, Inc. Central Trading thereupon exchanged the stock of Leaseholds C.A. for 4,950,000 shares of the stock of Leaseholds, Inc. Thus Leaseholds, Inc. became the sole owner of Leaseholds C.A. and Central Trading the owner of all the issued stock of Leaseholds, Inc. Ross then turned over 2,000,000 shares of Leaseholds, Inc. to one of the other organizers of Leaseholds C.A. and Central Trading sold 250,000 shares of Leaseholds, Inc. to brokers in Venezuela who proceeded to make a market for the stock. Not long thereafter Ross delivered 2,425,000 shares of Leaseholds, Inc. to one of the Venezuelans who was instrumental in securing the oil concession. Of these latter shares 540,000 were later returned to Ross.

In 1956 a group of American promoters known as "the San Jacinto group" because of the prominent participation of the San Jacinto Oil Company, provided the money to pay for the oil concession and assigned Leaseholds C.A. a half interest in the profits. In 1957 the San

---

1. It is agreed that the provisions of the 1954 Code are applicable. All references hereafter to the Internal Revenue Code will be to that statute.

Jacinto group offered to buy the interest of Leaseholds C.A. for San Jacinto stock. In 1958 Central Trading exchanged its Leaseholds, Inc. stock for San Jacinto stock, realizing a profit of $1,145,000 on the exchange.

The principal issue with which the district court had to deal was whether Central Trading's transactions in the stock of Leaseholds, Inc. during the years 1956, 1957 and 1958 made it a regular dealer in that stock within the meaning of Section 543(a). Under that Section, if Central Trading was a regular dealer in the stock then the gain realized from the sale or exchange of the stock would not be foreign personal holding company income subject to tax.

Ross also claims that the stock in Leaseholds, Inc. which he received was transferred to him in payment for his services in finding a promoter who was willing to put up the money to acquire the Venezuelan oil concession. If the stock was received in payment for services it was not foreign personal holding company income within the definition of that term in Section 543(a).

The district court found against the taxpayer on both of these issues.

In our consideration of appellant's claims we must be mindful of the limitations of our function. At the threshold there is a limitation that we share with the district court, the limitation imposed by the rule that the taxpayer had the burden of proof on these issues.

> "[A] taxpayer challenging the correctness of a tax assessment, as a defense in a collection case, has the burden of persuading the fact finder by a preponderance of the evidence that the assessment is incorrect * * *" United States v. Lease, 346 F.2d 696, 700 (2d Cir. 1965).

Moreover "the narrow function assigned to us" (Smith v. Commissioner of Internal Revenue, 305 F.2d 778, 782 (3d Cir.), cert. denied, 371 U.S. 904, 83 S.Ct. 208, 9 L.Ed.2d 165 (1962)) requires us, except in the most unusual circumstances, to accept the trial court's rulings on credibility and to disregard its findings only if we can hold that there is clear error. Heyman v. Ar. Winarick, Inc., 325 F.2d 584 (2d Cir. 1963). The boundaries by which reexamination of the inferences drawn from the facts by the district court is limited are at least as confining as they are in other types of cases. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Gaugler v. United States, 312 F.2d 681 (2d Cir. 1963); Austin v. Commissioner of Internal Revenue, 298 F.2d 583 (2d Cir. 1962); Smith v. Commissioner of Internal Revenue, supra.

The appellant's brief urges that the district court's conclusions on the principal issues are "against the weight of evidence" or of "credible evidence." But this court has no power to review on the weight of the evidence. John Fabick Tractor Company v. Lizza & Sons, Inc., 298 F.2d 63 (2d Cir. 1962). The standard of review has been stated by the Supreme Court:

> "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

In the case with which we are now concerned the evidence shows Central Trading did engage, through Ross & Company, in buying and selling Leaseholds, Inc. stock during the years 1956, 1957 and 1958. In September, 1956, at the time when it became evident that the oil concession would be acquired, Central Trading bought 20,000 shares. On widely separated dates between September and the end of the year it made two sales of Leaseholds, Inc. stock, one of 100 shares and one of 250 shares. At the end of 1956 Central Trading owned 358,950 shares of Leaseholds, Inc. During the early part of 1957 Central Trading sold 15,100 shares of Leaseholds, Inc. stock.

After May, 1957, Central Trading sold no more such stock but continued to acquire large amounts. In May, 1957 Central Trading owned 345,850 shares. At the end of 1957 it owned 363,500 shares and by June, 1958, just before the exchange of Leaseholds, Inc. stock for San Jacinto stock, Central Trading owned 836,500 shares of Leaseholds, Inc.

The trial court found that these transactions revealed a "pattern indicative of an investor or speculator rather than a dealer." The court cited Regulation 1.-543–1(b) (5) (ii) which provides:

> "The term 'regular dealer in stock or securities' means a corporation with an established place of business regularly engaged in the purchase of stock or securities and their resale to customers. However, such corporations shall not be considered as regular dealers with respect to stock or securities which are held for investment."

■ We cannot find clear error in the conclusion of the trial court that Ross failed to prove that Central Trading was a "regular dealer" in Leaseholds, Inc. stock during the years in question.

Ross's story that the Leaseholds, Inc. stock was received in payment for his services is supported only by his testimony. There is nothing on the books of the corporations involved, nor any other documentary evidence which lends support to Ross's version of the facts. The trial court refused to credit Ross's testimony and held that he had failed to prove that the stock was received for services. Again we are unable to conclude that the trial court's finding is clearly erroneous.

■ The third item in dispute is the 1959 interest income of Ross & Company. The books of Ross & Company show that it received interest from Central Trading (on its daily balances). Ross claims that this was interest paid to Ross & Company for transmission, after deduction of a small service charge, to firms which had lent money to Central Trading. Again the trial court refused to credit Ross's testimony and noted that nothing

in the books of the corporations suggested that the loan which Ross claims was made to Central Trading was actually made to it rather than to Ross & Company. Thus the court found no connection between the interest paid by Central Trading to Ross & Company and the interest paid by Ross & Company on the loan to it.

Once more we see no ground for holding that the trial court committed clear error.

The judgment for the United States must be affirmed.