James M. MORRISSEY and Ralph Ibrahim, individually and on behalf of the members of the National Maritime Union of America, Plaintiffs-Appellees and Cross-Appellants,

v.

Joseph CURRAN, as President of the National Maritime Union of America and individually, et al., Defendants-Appellants and Cross-Appellees,

and

NMU Staff Pension Plan,
Intervenor-Cross-Appellant.

Nos. 21, 39, 107, 108, 134 and 1449, Dockets 80–7204, 80–7230, 80–7292, 80–7322, 80–7390 and 80–7734.

United States Court of Appeals,
Second Circuit.

Argued Sept. 3, 1980.

Decided April 28, 1981.

Arthur E. McInerney, New York City (John S. Chapman, Jr., and Duer & Taylor, New York City, on the brief), for plaintiffs-appellees and cross-appellants.

William Perry, pro se.

Seymour M. Waldman, New York City (Waldman & Waldman, New York City, on the brief), for defendants-appellants and cross-appellees Wall, Barisic, Miller, Martin, and Bocker.

Ned R. Phillips, New York City (Phillips & Cappiello, New York City, on the brief), for intervenor-cross-appellant NMU Staff Pension Plan.

Thomas E. Engel, New York City (Daniel C. Walden and Hale, Russell, Gray, Seaman & Birkett, New York City, on the brief), for defendant-appellant and cross-appellee Joseph Curran.

Before TIMBERS, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal concerns the scope of the fiduciary duty imposed on union officers by § 501 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 501 (1976). James M. Morrissey and Ralph Ibrahim, members of the National Maritime Union, brought this action under § 501, alleging that the defendants—officers and an employee of the Union, including former Union President Joseph Curran—had breached their fiduciary duties by authorizing and receiving various forms of improper payments and excessive compensation. After protracted proceedings,[1] the United States District Court for the Southern District of New York (William C. Conner, Judge) found the defendants liable on some of the allegations of the complaint. Both sides have appealed. We affirm in part, reverse in part, and remand.

I

The Union's constitution requires that all forms of officer compensation must be approved by the vote of the Union membership. The constitution also permits the National Office, which consists of the Union's five officers and the national representatives, to authorize any expenditures it deems necessary for the proper administration of the Union's affairs. Six of the seven defendants are or were officers of the Union and constituted the National Office at the times relevant to this lawsuit. Joseph Curran was instrumental in founding the Union in 1937 and was its first President, serving from 1938 until his retirement in 1973. Shannon Wall succeeded Curran as President and is the only defendant who has not yet retired from his position; the others retired, before reaching age 65, during the course of this litigation. Mel Barisic was Secretary-Treasurer of the Union, and the remaining officers-defendants, Rick S. Miller, James J. Martin, and Peter Bocker, were Vice-Presidents and National Representatives. William Perry, the only non-officer defendant, was employed by the Union as Curran's assistant from 1958 until discharged in 1969.

Morrissey and Ibrahim (hereafter "Morrissey") challenged the reasonableness of the Union's officer pension and severance pay plans, as well as Curran's compensation arrangement, all payments that had been authorized by membership vote in accordance with the constitutional requirement. Morrissey also objected to two financial arrangements adopted by the National Office: flat weekly expense allowances and payments known as "pay in lieu of vacation." In addition, he alleged that the defendants used Union funds for numerous personal

---

1. Observing the jurisdictional requirements of 29 U.S.C. § 501(b) (1976), appellants filed their complaint on January 23, 1973, after having made a written complaint to the National Maritime Union in 1971, and were granted leave to commence proceedings by the District Court for the Southern District of New York (Robert L. Carter, Judge). They were allowed to file an amended complaint on February 25, 1975, and presented their case before Judge Conner in February 1976. After a two-month adjournment, additional trial testimony was taken in April 1976. Judge Conner dismissed some of the claims in an unreported decision on May 19, 1977, after which the defendants presented their case in the beginning of December 1977 and in January 1978.

expenses. The facts and the District Court's rulings are more appropriately set forth in connection with each of the myriad of claims that we are obliged to consider.

## II

Before turning to the specific claims, we must give some consideration to the scope of § 501 and the judicial role it contemplates. The recurring issues on this appeal are whether judicial inquiry into union activities under § 501 must cease when the officers' actions have been duly authorized by the union membership, constitution, or bylaws; and whether the fiduciary standard imposed upon union officers by § 501 more closely approximates the common law norms for trustees or those for corporate directors. As Justice Frankfurter observed, "[T]o say that a man is a fiduciary only begins analysis; it gives direction to further inquiry" which includes asking "What obligations does he owe as a fiduciary?" *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943).

Section 501(a) declares that union officers "occupy positions of trust in relation to [the union] and its members" with respect to the funds they manage, but cautions that the fiduciary obligations of these officers should be interpreted with due regard to the "special problems and functions of a labor organization." 29 U.S.C. § 501(a) (1976). Aware of the different degrees of fiduciary responsibility that existed at common law, Congress expected contextual considerations to shape the standard applicable to union officials. *See* Supplementary Views [2] to H.R.Rep.No.741, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad.News 2318, 2475, 2480. This sensitivity to the special labor context in § 501 is reflected in one of the principles Congress expressly followed in drafting the overall legislative scheme: minimum interference in the internal affairs of unions. S.Rep.No. 187, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad.News 2318, 2323. Focusing on this principle, the defendants argue that the District Court could not consider the reasonableness of any of the payments because they were authorized by either the vote of the Union membership or the National Office acting pursuant to the "necessary expenditures" clause of the constitution and bylaws.

Although Congress contemplated minimal judicial intrusion and did not intend the statute to limit the purposes for which a labor organization's funds could be expended when decisions had been made by members in accordance with their constitution and bylaws, *see, e. g.,* 105 Cong.Rec. 17,900 (1959) (Sen. Kennedy), we do not think that Congress thereby intended to establish authorization as a complete defense to § 501 claims.[3] For that would permit a union constitution to vest limitless spending power in union officers and, even where membership vote is required, leave dissenting members powerless to halt abusive practices. Such a result could not have been intended by a Congress anxious to curb the wide-scale corruption among union officials

---

**2.** The only commentary to the section in the published reports appears in the Supplementary Views of Representatives Elliott, Green, Thompson, Udall, and O'Hara, appended to the House Report. The Senate bill had no counterpart to § 501 and the provision, which had been included in Representative Elliott's bill, was adopted in Conference without discussion.

**3.** We are aware of the disagreement among commentators as to whether authorization is a complete defense, *compare* Clark, *The Fiduciary Duties of Union Officials Under § 501 of the LMRDA*, 52 Minn.L.Rev. 437, 443, 448–51 (1967) (authorization could not have been in-

tended as complete defense); Summers, *American Legislation for Union Democracy*, 25 Modern L.Rev. 273 (1962) (same); Wollett, *Fiduciary Problems Under Landrum-Griffin*, 13 N.Y.U. Conf. on Labor 267, 279 (1960) (same); and Note, *The Fiduciary Duty of Union Officers Under the LMRDA: A Guide to the Interpretation of Section 501*, 37 N.Y.U.L.Rev. 486, 493–98 (1962) (same) *with* Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819, 829 (1960) (authorization is defense) *and* Smith, *The Labor-Management Reporting and Disclosure Act of 1959*, 46 Va.L.Rev. 195, 228 (1960) (same).

found by the McClellan Committee,[4] which had identified the need for legislation, *see* S.Rep.No.187, *supra* [1959] U.S.Code Cong. & Ad.News at 2318.

Congressman Barden, the Chairman of the House Committee on Education and Labor, stated that a union's constitution and bylaws were not solely determinative of the scope of fiduciary duty under the Act. 105 Cong.Rec. 18,153 (1959). This view is further reflected in § 501(a)'s prohibition of exculpatory provisions in union constitutions, bylaws, or membership resolutions. Even legislators willing to give substantial deference to union authorization were concerned primarily about judicial intrusion into union politics and social policies, which might lend support to anti-labor forces, *cf.* 105 Cong.Rec. 17,900 (1959) (Sen. Kennedy); *see McNamara v. Johnston*, 522 F.2d 1157 (7th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); they did not contemplate giving free rein, through the device of authorization, in the use of union funds for the personal benefit of union officers.

■ Analysis of the special labor context reenforces this view of the congressional purpose. The centralization of power and authority in modern labor unions, as their membership has grown, has resulted in an organizational structure in which the rank and file may not be able to influence union policy effectively. A group of officers runs the union's daily affairs, with broad powers to construe the constitution and bylaws and ample opportunity to permit questionable spending practices. *See* Note, *The Fiduciary Duty of Union Officers Under the LMRDA: A Guide to the Interpretation of Section 501*, 37 N.Y.U.L.Rev. 486, 495–98 (1962). Similar problems of inadequately restrained management have been noted in the corporate structure, where the divergence between management and shareholder interests creates opportunities for financial abuse by corporate managers, and direct monitoring of management by shareholders is difficult and expensive.[5] *See* Jensen & Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J.Fin.Econ. 305 (1976). But unlike shareholders, who can sell their ownership interest if dissatisfied with management's conduct, union members dissatisfied with an unresponsively-managed union cannot sell their membership rights nor, in most cases, is it realistic to expect them to resign from membership or change to another union. Moreover, while external checks on corporate managerial abuses are sometimes imposed by market forces—the hiring and firing of corporate managers and the buying and selling of corporate control, *see* Jensen & Meckling, *supra*, there is little evidence of similar restraints upon union leadership.

■ We have recognized, as have many other courts, that the Act does not give courts a license to interfere broadly in internal union affairs. *Gurton v. Arons*, 339 F.2d 371, 375 (2d Cir. 1964); *see Gabauer v. Woodcock*, 594 F.2d 662 (8th Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1768, 32 L.Ed.2d 135 (1972). At the same time, authorization cannot be used to shield the very acts that prompted the legislation, misappropriation and abuse of union funds by officers for their personal

---

**4.** The Senate Select Committee on Improper Activities in the Labor and Management Field.

**5.** Even shareholder authorization does not immunize the compensation decisions of corporate directors from judicial scrutiny. *See Fogelson v. American Woolen Co.*, 170 F.2d 660 (2d Cir. 1948) (reasonableness of employee pension plan); *Winkelman v. General Motors Corp.*, 44 F.Supp. 960 (S.D.N.Y.1942) (management bonus plan); *cf. Rogers v. Hill*, 289 U.S. 582, 591, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933) (bonus plan adopted under bylaw that share-holders approved; changed circumstances in company's profits rendered payments under bylaw unreasonable); *Michelson v. Duncan*, 407 A.2d 211 (Del.1979) (shareholder ratification of unauthorized stock option plan approved by directors shifts burden back to plaintiff to prove amount unfair); *Lattin on Corporations* § 77 (2d ed. 1971) (disinterested board or shareholders may ratify otherwise voidable contract compensating interested director, and burden then on person attacking salary to show payments unreasonable).

benefit. *See McNamara v. Johnston, supra*, 522 F.2d at 1163 (no § 501 breach where expenditure authorized so long as funds expended without personal gain); Clark, *The Fiduciary Duties of Union Officials Under § 501 of the LMRDA*, 52 Minn.L.Rev. 437, 450 (1967) (authorization protects officer from liability only where no personal benefit accrued to officer from expenditure). We thus adopt the view, consistent with the thrust of § 501, that where a union officer personally benefits from union funds, a court in a § 501(b) suit may determine whether the payment, notwithstanding its authorization, is so manifestly unreasonable as to evidence a breach of the fiduciary obligation imposed by § 501(a).[6] *Cf. United Mine Workers v. Boyle*, 78 Lab.Cas. (CCH) ¶ 11,183, at 20,051 n.5 (D.D.C.1975) (judicial scrutiny of authorized expenditure); *Puma v. Brandenburg*, 324 F.Supp. 536, 544 (S.D.N.Y.1971) (same); *Nelson v. Johnson*, 212 F.Supp. 233, 257–59 (D.Minn.1962), aff'd, 325 F.2d 646 (8th Cir. 1963) (same); *Highway Truck Drivers & Helpers Local 107 v. Cohen*, 182 F.Supp. 608, 620–21 (E.D.Pa.), aff'd, 284 F.2d 162 (3d Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961) (same).

■ Similar considerations guide our interpretation of what fiduciary standard governs the actions of union officers. Morrissey argues that the appropriate fiduciary standard for union officials is the highest available standard, that of the trustee, at least in this case where self-dealing has been alleged. Trustees are held to a strict standard of undivided loyalty, which prohibits undisclosed self-dealing. *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928). Under such a standard, even if the beneficiary consents to a transaction that benefits the trustee, the fiduciary must nonetheless demonstrate the reasonableness and fair-

ness of the amount he has received. Restatement (2d) of Trusts § 170, Comment w, and § 216 (1959).

■ Defendants contend that a less rigorous standard, that applicable to corporate officers and directors, is more appropriate for union officials, particularly in this case because the issues concern compensation, which is received for services rendered to the Union. Such services, they argue, benefit the Union, and therefore remove the challenged transactions from typical self-dealing. Under the fiduciary standard for corporate directors, a business judgment rule is ordinarily applied, which presumes the reasonableness of the fiduciary's decision. *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 381 (2d Cir. 1980). The rule, however, does not apply to situations involving self-dealing, where there is a conflict of interest on the part of the directors in the transaction; in such cases a court will review the merits of the decision, and the fiduciary must establish its reasonableness. *Lewis v. S. L. & E., Inc.*, 629 F.2d 764, 769 (2d Cir. 1980).

■ While it may be true that corporate compensation arrangements are normally reviewed under the standard of the business judgment rule, this occurs because usually the compensation arrangements for the corporate managers are determined by the outside directors. *E. g., Beard v. Elster*, 39 Del.Ch. 153, 160 A.2d 731 (1960). In this case, however, the individuals receiving the payments are the same persons who established the compensation schedules. In such circumstances judicial scrutiny of the reasonableness and fairness of the transaction is warranted, at least as rigorous as that undertaken when the fiduciary is a corporate director who has an interest in the

---

**6.** Our decisions regarding the intent requirement and the implications of authorization for § 501(b)'s criminal counterpart, 29 U.S.C. § 501(c) (1976), see *United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975); *United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), are not determinative. As we noted implicitly in *Ottley*, and as we now explicitly hold, the standard for criminal intent for a breach of a § 501(a) fiduciary duty and its concomitant defense of good faith as to union benefit or authorization under § 501(c), does not control in a civil action brought under § 501(b). *See United States v. Ottley, supra*, 509 F.2d at 672 (effect of authorization may differ in civil action); *United States v. Ladmer*, 429 F.Supp. 1231, 1242 (E.D.N.Y.1977) (same).

challenged transaction.[7] *Ballantine on Corporations* § 76, at 193 (rev. ed. 1946).

The statutory flexibility in construing labor fiduciary standards was designed to protect union leaders from being held to trustee standards with respect to fund investment policies and to prevent use of the Act to harass or restrict legitimate union activities such as expenditures for education or political causes; in both instances, union goals of advancing membership interests would result in economic policies or decisions different from those expected of a traditional trustee, whose sole legitimate aim is to preserve the trust corpus. *See* 105 Cong.Rec. 17,900 (1959) (Sen. Kennedy); Dugan, *Fiduciary Obligations Under the New Act*, 48 Geo.L.J. 277, 290 (1959). Section 501's emphasis on the particular facts of the case, in determining the appropriate fiduciary standard, and the policy underlying its enactment—preventing officers' misuse of union funds for their personal benefit—support judicial review of authorized expenditures that impart personal financial gain to those officers, just as courts would review self-interested transactions under the corporate director fiduciary standard developed at common law. Under this standard, the court is not at liberty to revise any compensation arrangements more generous than the court might have established. Section 501 does not convert judges into paymasters for union officers. The fiduciary standards for union officers impose liability upon them when they approve their receipt of excessive benefits, significantly above a fair range of reasonableness. With these principles in mind, we turn to the specific contentions raised on this appeal.

### III

#### A. Morrissey's Claims

#### 1. Curran's Net Salary Contract

Curran was paid under a "net" salary contract, an arrangement approved by the membership. The Union paid Curran a gross compensation amount sufficient to cover his income taxes so that he would "net" after taxes the authorized salary amount.[8] Morrissey challenges the District Court's finding that Curran's net salary contract was validly authorized by the Union membership. He contends the authorization was invalid because the membership did not know, when it approved the contract, that "net" meant "net after taxes." He also contends that the contract was void and unenforceable because it allegedly violated New York State tax laws.

■ Morrissey testified that the meaning of "net" was not discussed at the membership meetings at which the salary arrangement was approved and that he though "net" meant "net after expenses." He also stressed that no one knew the total gross salary that Curran received. But there was ample evidence in the record to contradict his contentions. Defendants' witnesses, who were union port agents, testified that the meaning of the term "net" was discussed at the membership meetings and that the members did know and understand that it referred to "net after taxes." There was evidence that seamen's standard pay vouchers reflect both a gross and net salary, the latter shown as net of all income taxes, and that Morrissey's newspaper in subsequent years publicized the fact that Curran's gross pay was much higher than his

---

7. While a trustee is held to a strict standard, and transactions violating the duty of loyalty to the beneficiary will be struck down regardless of gain or loss to the trustee, G. Bogert, *Trusts and Trustees* § 543, at 218 (2d rev. ed. 1978), this prohibition is not absolute. Courts may excuse trustee breaches if the trustee has acted honestly and reasonably, Restatement (2d) of Trusts § 204, Comment g (1959), and they may subsequently approve or validate a trustee's disloyal act if convinced that the beneficiaries will benefit from such an order, G. Bogert,

*supra,* § 543(U), at 380 (collecting cases). In practice, then, the trustee standard may approach the standard for corporate directors who have engaged in self-dealing.

8. In 1958, when the membership first authorized a net salary contract for Curran, this amount was $25,000. By his retirement in 1973, his authorized net had been increased to $48,972. No other officer or employee was paid on a net salary basis.

authorized net salary. Given the conflicting testimony in the record, the District Court's conclusion that Curran's net salary contract was knowingly authorized by the membership was not clearly erroneous.

■ We further find Morrissey's argument concerning New York State's tax laws unpersuasive. Section 385 of New York Tax Law provides that a contract to pay another taxpayer's taxes is void and unenforceable. N.Y.Tax Law § 385 (McKinney 1975). But the Union did not contract to pay Curran's income taxes; it agreed to pay him a gross salary sufficiently high so that he would net the authorized amount after he paid his own taxes. The arrangement does not technically come within the scope of the statute, and the likely purposes of the statute are neither frustrated nor affected. Presumably, New York intended to prevent the revenue loss and tax avoidance possible from a shifting of income between the taxpayers who are parties to such a contract. Cf. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929). In this case, the State fisc did not incur any losses because no income attributable to one taxpayer was shifted to another; the total income Curran received was included in his own income when he computed and paid his taxes. We therefore affirm the District Court's dismissal of this charge.

### 2. Severance Pay

Severance pay was based on years of Union service [9] and was received in a lump sum upon retirement. The District Court rejected Morrissey's claim that the officers' severance pay was excessive, finding that the payments were validly authorized and not excessive. Morrissey's only "evidence" of excessiveness was the fact that Curran received severance pay equal to three years' salary, and that officers received severance pay in addition to pension benefits.

■ We see no reason to reject the District Court's findings. The evidence provided no basis for concluding that three years' salary is excessive severance pay for an individual who has worked 35 years for his employer.

### 3. Surcharge of Defendants Other Than Curran

The District Court rejected Morrissey's request that all of the defendants be surcharged for each other's liability. Assuming that a surcharge is a permissible form of relief under § 501, an issue to be considered with respect to Curran's appeal, infra, we agree with the District Court that Morrissey's request for a surcharge should be denied.

■ During the proceedings, Morrissey's counsel expressly waived the claim of surcharge against all defendants except Curran. On a motion for reconsideration, the Court found that this waiver applied only to liability for Curran's pension benefits. Nevertheless surcharging the other defendants was properly refused on grounds of fairness to them, particularly because the Court had rejected their defense of laches on the assumption that they would not be surcharged.

### 4. Personal Jurisdiction Over Defendants Nesbitt and Strassman

■ The District Court held that it did not have personal jurisdiction over two officers, Robert Nesbitt and Leo Strassman, because Morrissey had failed to serve these two defendants and neither had entered an appearance. Although their names appeared with the other individual defendants on numerous papers submitted by counsel during the litigation, the same counsel represented all the individual defendants apart from Curran. The Court consequently treated the appearance of their names as mere inadvertence by counsel, insufficient to establish jurisdiction. Neither Nesbitt nor Strassman filed an answer to the original complaint. Morrissey offered no expla-

**9.** For example, persons with 25 years of service received a payment equal to one month's pay for each year. Curran, with 35 years of service, received a gross payment of $363,296.46, for a calculated net of $142,834, or 35 months' pay.

nation as to why only one attempt was made to serve these two defendants or why, if difficulty was encountered, he did not seek the Court's approval of some form of substituted process; both were amenable to process under New York's long-arm statute. We therefore find no basis for overturning the Court's holding that Nesbitt and Strassman are not bound by the judgment.

### 5. *Defendants' Attorneys' Fees*

■ After the trial, Morrissey moved to enjoin any payment by the Union of the officers' attorneys' fees. The attorneys currently representing the defendants submitted affidavits, stating that they had not been paid by the Union and the officers would not seek reimbursement until after the disposition of the appeals, and then only to the extent that they are exonerated from the charges. Since Morrissey presented no evidence that the Union was then paying, or planned to pay, those legal fees, the District Court denied the motion. We affirm. Counsel's affidavits that no fees will be sought until after the disposition of the appeals are sufficient evidence for denying the injunction as they demonstrate there is no irreparable injury.

■ Morrissey also moved the Court to order repayment of $15,000 that the Union had paid to an attorney who had represented the officers earlier in these proceedings.

The fee was paid after the Court had dismissed many of the charges against the officers. In *Morrissey v. Segal*, 526 F.2d 121 (2d Cir. 1975), this Court upheld an allocation of the costs of legal services that could be reimbursed by a union in a § 501 action, where the defendant officer was held liable on some charges while other charges were dismissed. The Court approved reimbursement for his fees with respect to the dismissed charges. Although there is no precise indication in the record of the total fee charged the defendant officers in this case, and consequently of the precise share that the $15,000 represents, the District Court was entitled to conclude, absent contradicting evidence, that $15,000 represented a lesser proportion of the total fee than the percentage of time allocable to claims successfully resisted.

### B. *Curran's Claims*

### 1. *Pension Recalculation*

Curran's pension benefits, amounting to 87.5% of his average working salary (2½% × 35 years), were calculated by the Union on the basis of his *gross* salary.[10] The District Court ordered Curran's benefits recalculated according to his *net* salary. The Court reasoned that the pension plan was designed to establish a fixed ratio between each recipient's working income and his retirement receipts and that calculating

---

10. Under the Officers' Pension Plan in effect when Curran retired, an officer received a pension of 2½% of his "average" salary for each year of service up to a maximum of 40 years, when 100% would be reached. Average salary was computed on the assumption that the officer's salary was no less than the salary he received in 1963. If the officer had worked for 30 years, for example, he would receive pension benefits equal to 75% of his average salary. The officer also had the option of receiving a lump-sum payment of "equivalent value" in full upon retirement, which was the present value of anticipated payments over his expected lifetime, discounted by 3%. There were also options for those who chose to receive the annuity to continue the benefits to their survivors after their death.

In 1972, a new plan was created, the Staff Pension Plan, which is the current plan and the one under which the other defendants have retired or will retire. This plan provides gener-

ally the same benefits with two major changes. "Average" was redefined as the compensation received in the highest 60 complete calendar months of the last 120 complete calendar months prior to retirement or termination, divided by 60. Three accelerated-payment options, in addition to the lump-sum payment schedule, were offered as alternative benefit schemes. The District Court found that in view of inflation and the rates of salary increase, the Officers' Pension Plan's "regular" (non-accelerated) payments were not unreasonable because average salary was computed back to 1963 pay rates. But in comparing the Staff Pension Plan, the Court found that by changing the average salary computation method, the new plan reduced the effect of past inflation in moderating pensions and resulted in too excessive a benefit schedule, in view of actual interest yields and the availability of accelerated payment options.

Curran's pension according to his *net* income would be consistent with the calculation of his salary and would therefore best fulfill the intentions of the plan. The Court also observed that because the tax rates applicable to Curran's retirement income were lower than those applicable to his working income, calculating the pension according to gross pay increased Curran's net pension benefits above 87.5% of his average net working salary.

■ Although the District Court's approach to the computation of Curran's benefits is reasonable in attempting to achieve symmetry between Curran's unique employment contract and his pension receipts, the pension plan contract provides otherwise. The pension plan unambiguously defines average salary as the recipient's "total compensation." The Union's use of Curran's gross salary as the benefit base was clearly authorized by this plain language. Moreover, the Court's observation concerning the effect of tax brackets on the relationship between net receipts before and after retirement is irrelevant: the same asymmetry holds to some degree for all recipients, whether paid on a "net" or "gross" compensation basis, because of the lower tax rates imposed on the lower income usually received in retirement.[11]

■ The District Court did not find that the terms of the Officers' Pension Plan under which Curran retired were unreasonable, but that the way the Union applied them to Curran was. We disagree. Curran's pension was generous, but so was his salary. As long as a union's actions involve a reasonable interpretation of a contract, § 501 does not authorize a court to substitute its interpretation for that of the union, nor to revise the resulting payment unless the payment is grossly excessive.[12] *See Vestal v. Hoffa, supra,* 451 F.2d at 709.

## 2. *Net Salary Calculation and Tax Refunds*

The District Court revised the Union's method of calculating Curran's net salary by requiring an adjustment based on the amount of taxes actually paid. An accounting was ordered to determine the difference between the tax paid each year (on gross compensation) and the amounts the Union had included as estimated taxes in Curran's gross compensation. The Court also ordered Curran to repay any tax refunds he received while employed under the net salary contract. The Court reasoned that the refunds properly belonged to the Union because the Union had paid Curran his authorized net plus estimated taxes and a refund would increase his net salary above the authorized amount. The Court also observed that an unauthorized salary increase may have resulted to whatever extent the amount estimated for taxes covered taxes on Curran's outside income. Because Curran paid no estimated tax on his non-Union income (and none was withheld), the Union's gross compensation covered Curran's taxes on that non-Union income in years when Curran did not have to pay at year-end the full amount of taxes attributable to outside income. The Court therefore ordered an accounting to determine any amounts owing as unauthorized payment of Curran's taxes on his outside income.

11. For example, if an officer earned $50,000 as his highest average salary and worked for the same number of years as Curran, 35, so that his benefits were to equal 87.5% of his salary, his pension would be $43,750 (87.5% of $50,000). Assuming no other income, exemptions, or deductions, and that the officer is a married individual filing a joint return, his taxes on the working income of $50,000 would be $14,778, leaving him a net income of $35,222, while his taxes on the retirement income of $43,750 would be $11,838.50, leaving him a net income of $31,911.50. I.R.C. § 1(a) (rates effective as of 1979). (Because the Union made all the contributions to the pension plan, all of the benefits are taxable income to the employee.) This net retirement income of $31,911.50 is not 87.5% of the net working income of $35,222; it is 90.8% of that income.

12. Our approval of calculating the pension benefit on Curran's gross compensation does not affect any recalculation of benefits necessitated by other findings of the District Court that amounts included in Curran's gross compensation were improperly received.

■ We agree with Judge Conner that payments received above Curran's authorized net salary in the form of either tax refunds or taxes paid on non-Union income were not authorized by the Union membership and consequently could not be paid as compensation. We caution, however, that the required adjustment of Curran's compensation to account for taxes actually paid is not a one-way street. If, as Curran maintains, in some years he had to pay additional taxes at year-end because the Union did not withhold sufficient taxes, that would result in an improper diminution of his authorized net. He is entitled to be reimbursed by the Union for any taxes he paid that are attributable to his Union compensation.

### 3. Severance Pay Recalculation

■ Curran's severance pay was calculated according to his authorized net monthly salary, multiplied by his 35 years of service; to this sum was added the tax payable on the net severance pay to obtain the gross payment amount. Approving that method of calculation, the District Court ordered an accounting to determine whether the amount Curran received for taxes payable on his severance pay exceeded the amount of taxes actually paid and ordered Curran to refund any excess. As with net salary, this adjustment was proper under § 501 to avoid receipt of any unauthorized severance pay.

### 4. Pay in Lieu of Vacation

All Union officers were entitled to paid vacations, which had been increased, by membership vote in 1969, from four weeks to 60 days. The National Office adopted a policy whereby officers and employees who did not take their vacations, but instead spent the time working, received their salaries for that time in addition to their paid

vacation money. Because the officers never took their full vacation time, the ultimate effect of this practice was receipt by most of the officers of an additional one month's salary each year, without membership authorization.

■ The District Court found that Curran had taken his vacation every year and had not worked during that time, and ordered him to reimburse all pay in lieu of vacation that he had received from 1963–1973. These amounts were also to be subtracted from the total compensation figure used to calculate his pension benefits. The Court based its finding, in part, on the fact that Curran bought a home in Florida in 1964, and several pleasure boats, and thereafter was rarely in New York; Perry's testimony that Curran did not do much work for the Union and spent most of his time in Florida; Curran's admission, in response to questioning by the Court, that in two years, 1968 and 1970, he took vacations and received pay in lieu of those vacations; and the Union's failure to keep any records for Curran's vacation time after 1963 despite keeping vacation-time records for all other officers. We reject Curran's challenge to the sufficiency of the evidence and conclude that the District Court's finding was not clearly erroneous.[13]

### 5. Travel Between Florida and New York

The Union paid Curran's travel expenses between his home in Florida and the Union headquarters in New York. Reasoning that Curran's change of residence was based on personal considerations and that the Union should not have to bear the additional costs of travel attributable to Curran's personal preferences, the District Court ordered an accounting to determine whether these payments were reasonably necessary for the conduct of substantial Union business in Florida.

13. Curran does validly point out one error in the Court's assessment of the evidence: the Court assumed that Curran's receipt of pay in lieu of vacation in his first paycheck of each year indicated that those payments were received as automatic pay increases in advance of whatever vacation time he would take in the forthcoming year. But the records show that the payments received in the beginning of a year were for vacation time allegedly not taken in the preceding year. However, we do not think that this misapprehension undermines the District Court's basic factual finding that Curran did not work during his vacation time.

Curran contends on appeal[14] that there was no evidence concerning any personal reasons for his move, although he does acknowledge that his age and declining health were established in the record. He argues that, because the Union constitution and bylaws make no reference to the President's residence and there was no evidence that reimbursement of his travel expenses was unreasonable, the District Court could not overrule the National Office's decision to treat the travel expenses as a necessary expenditure under the Union constitution.

■ There is no dispute that the Union constitution did not require Curran to live in any particular place. But that does not resolve the problem that concerned the Court; the issue is whether the Union members had to foot the bill for Curran's travel to work when he chose to live at great distance from the Union office. Under a well-established principle of federal tax law, commuting costs are considered non-deductible personal expenses and not business expenses. *Commissioner v. Flowers*, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203 (1946); M. Chirelstein, *Federal Income Taxation* 92–94 (2d ed. 1979). While tax law standards need not strictly apply, we agree with the District Court that if Curran's reimbursement was solely to enable him to "commute" from his home in Florida to New York and not to attend to union-related business in Florida, then the payments subsidizing Curran's residential preferences were not properly reimbursable business expenses within the scope of the "necessary expenditures" clause.[15] An accounting will determine the appropriate characterization of these payments. If they represent commuting costs, they were not contained in

the authority granted to the National Office by the "necessary expenditures" clause, and therefore would constitute unauthorized compensation that Curran must repay.

### 6. Legal Fees

The Union paid $7,527.97 for Curran's legal fees in defense of *Wimbush v. Curran*, an action brought in the Southern District of New York under § 501 for fiduciary breaches similar to those alleged on this appeal. The action in *Wimbush* was dismissed for failure to prosecute; at about the same time, the plaintiff Wimbush received $10,000 from the Union. Curran contends that Wimbush received the money in settlement of another complaint that Wimbush had filed with the New York Division of Human Rights, alleging racial discrimination by the Union; upon receipt of the money Wimbush signed a release which excluded the § 501 action. Curran thus maintains that the Union's payment of his legal fees was proper because he was successful in Wimbush's § 501 lawsuit, *see Morrissey v. Segal, supra.*

■ The District Court properly declined to attach any significance to the statement in the release excluding Wimbush's § 501 action. That suit could not in any event have been settled by payment of cash to Wimbush because it had been brought in a derivative and not an individual capacity. But the question remains whether that suit can be considered to have terminated successfully from Curran's standpoint. The District Court found it could not be so viewed, noting that Morrissey filed this suit at about the same time Wimbush abandoned his own suit. It is possible that Wimbush considered some

14. The District Court's liability ruling concerning Curran's Florida-New York travel expenses is not a final order, in advance of the accounting. We granted appellants' motion for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (1976) with respect to this ruling, as well as the rulings concerning the surcharge of Curran, part III(B)(8), *infra*, and the officers' foreign travel, part III(C)(2), *infra*.

15. We do not suggest that the "necessary expenditures" clause of the Union's constitution

must be rigidly construed in all instances to conform to all tax law decisions concerning deductibility. The Union's National Office is entitled to take a somewhat more generous view than the Internal Revenue Service of what is necessary to conduct business, but payments to enable Curran to live in Florida when his work was in New York are sufficiently beyond even an allowable scope of generous interpretation to justify condemnation under § 501.

part of the funds received for settling his civil rights suit as an inducement to drop his § 501 suit, and the filing of Morrissey's suit may have been in reality a continuation of Wimbush's suit. However, there is no evidence to support such speculation. From Curran's standpoint, the Wimbush suit was successfully resisted, and we reverse the District Court's ruling that the Union's payment of his legal fees in connection with that suit was improper.

### 7. Morrissey's Attorneys' Costs

The District Court ordered the defendants to pay Morrissey's attorneys' costs. Curran appeals this ruling, contending that under the statute, recovery of such fees can only be assessed against the Union, and not against individual defendants.

 Section 501(b) specifically permits a court to award attorneys' fees out of the union's recovery in the underlying action. There is no directive permitting it to charge the fees against individual officers. Congress adopted a theory of beneficial recovery in § 501(b), that the individual union member who brings the action on his union's behalf confers a benefit on the union through his successful litigation. He is entitled to recover his costs from the union because, under the normal presumption against costs, the union would have had to pay those fees if it, and not the member, had undertaken the lawsuit. This Court has limited the source of recovery of counsel fees in the context of shareholder derivative suits, where the litigant's right to bring the action is also based on a theory of beneficial recovery; in such cases we have denied recovery of counsel fees against individual defendants where a common recovery fund was established. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1309 (2d Cir. 1973). We believe that § 501 requires the same approach. Although no other court appears to have considered assessing fees against individual defendants, fees in § 501(b) litigation have been consistently charged solely against the unions and not the individual defendants, even where there was no monetary recovery by the union, e.

g., *Kerr v. Shanks*, 466 F.2d 1271 (9th Cir. 1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973); *Local No. 92, International Association of Bridge, Structural & Ornamental Iron Workers v. Norris*, 383 F.2d 735 (5th Cir. 1967). Accordingly, in light of the statutory scheme, *see Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), we conclude that the District Court could not order Morrissey's counsel fees to be paid by the individual defendants and that these fees can only be recovered from the Union.

### 8. Surcharge

The District Court held that Curran could be surcharged for all improper payments received by other defendants, of which Curran had knowledge. Curran appeals this ruling, contending that a surcharge is not a proper remedy under § 501.

Section 501(b) authorizes a union member to seek a wide array of remedies for fiduciary breaches: "to recover damages or secure an accounting or other appropriate relief." In *Nelson v. Johnson, supra,* 212 F.Supp. at 288, 296, the Court broadly construed the remedies available in order to ensure enforcement of the objectives of the LMRDA. Upholding the availability of injunctive relief under § 501, the Court stressed that this was not a novel form of relief and that injunctions were traditionally issued against trustees at common law. Only one reported decision appears to have applied a surcharge in a § 501 action; in *Morrissey v. Curran*, 483 F.2d 480 (2d Cir. 1973), *cert. denied*, 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974) ("*Morrissey I*"), this Court upheld a surcharge imposed against a trustee of the union's pension fund for acting in reckless disregard of his duty by approving pension payments to individuals not covered by the plan. We do not think that the responsibility of a union officer differs sufficiently from that of a pension trustee with respect to liability under § 501 to justify a different conclusion concerning the availability of the surcharge remedy in this case.

■ At common law, an accounting surcharging a trustee for breach of his fiduciary duty was a readily available remedy. *See* G. Bogert, *Trusts and Trustees* § 863, at 17 (2d ed. 1962). A trustee was subject to surcharge for loss, destruction, or diminution in value of the trust property if he failed to exercise the requisite skill and care, which was measured by an ordinary prudent man standard. 2 *Scott on Trusts* § 176, at 1419 (3d ed. 1967). If a trustee was acting in his own interest in connection with performing his duties as a trustee, he was held accountable for any loss to the estate or any profit he made, even if the transaction was fair and reasonable. 2 *Scott, supra*, § 170.25, at 1387. Further, trustees have been surcharged where they have not personally profited from their breach, in situations where they have either negligently or knowingly permitted third parties to benefit from the trust property. *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951) (reorganization trustee surcharged for profits made by employees whom he knowingly permitted to trade in securities of debtor's subsidiary corporations); *In re Johnson*, 518 F.2d 246 (10th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) (trustee of creditor's trust in bankrupt corporation surcharged for bookkeeper's defalcations, which trustee negligently failed to discover). For a trustee's account to be surcharged, he need not be guilty of fraud or intentional wrongdoing, but simply have failed to discharge a duty required by law. *In re Johnson, supra*, 518 F.2d at 251.

These traditional trustee surcharge rules would be inapplicable to Curran only if fiduciary law distinguished between the remedies afforded against trustees and those against other fiduciaries. But the same general rules of surcharge do apply to other fiduciaries. *See Fulton National Bank v. Tate*, 363 F.2d 562, 571 (5th Cir. 1966) (citing the Restatements of Agency and Restitution, which hold agent and fiduciary personally liable for profits received in violation of duty to principal or beneficiary, respectively, even if transaction undertaken in good faith and transaction terms fair). In *Nelson v. Johnson, supra*, the Court made no distinction between the law applicable to trustees and that to other fiduciaries in determining that injunctive relief was available under § 501. Similarly, we see no reason not to permit a surcharge, when warranted by the facts, against one occupying any fiduciary status.

In comparable contexts surcharge-like remedies have been applied to fiduciaries other than traditional trustees. Several courts have held corporate directors and officers, who have improperly expended corporate funds on management compensation, liable for the expended amounts, though they were not the recipients. *E. g.*, *Dwyer v. Tracey*, 118 F.Supp. 289 (N.D.Ill. 1954) (director liable for salary payments to children of deceased officer); *Beacon Wool Corp. v. Johnson*, 331 Mass. 274, 119 N.E.2d 195 (1954) (directors liable for employee bonuses); *Haberman v. New York Ambassador, Inc.*, 272 A.D. 375, 71 N.Y.S.2d 196 (1st Dep't 1947), *aff'd*, 297 N.Y. 836, 78 N.E.2d 861 (1948) (directors may be held liable for management contract); *see* H. Henn, *Law of Corporations* § 255 (2d ed. 1970). Moreover, holding tippers of inside information liable for the profits of their tippees under the federal securities laws, *see Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), constitutes, in effect, a surcharge of the tipping directors and officers, who are fiduciaries of the shareholders, for gains made by third parties as a result of the fiduciary's violation of his trust. *Cf. Gratz v. Claughton*, 187 F.2d 46, 51 (2d Cir.), *cert. denied*, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951) (analogizing shareholder derivative action to recover insider's profits for violating § 16(b) of Securities Exchange Act to action surcharging trustee for profits made). In *Miller v. American Telephone & Telegraph Co.*, 507 F.2d 759 (3d Cir. 1974), the Third Circuit upheld a surcharge claim against directors in a shareholder derivative suit alleging breach of fiduciary duty by failing to collect debts owed by the Democratic National

Committee; the claim sought to surcharge the directors for the uncollected amounts. In *Nedd v. United Mine Workers*, 556 F.2d 190 (3d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978), the Third Circuit allowed a union to be surcharged for breaching a duty of loyalty to pensioners in violation of § 302 of the LMRDA, holding the union liable as the effective trustee of the members' jointly-managed employee pension fund.

 We think the objective of § 501, curbing officer abuses of union funds, will be promoted by upholding use of a surcharge remedy, as applied by the District Court in the circumstances of this case, against a dominant union officer, where he knowingly authorized the improper payments. The District Court's qualification that only a "knowing" misuse of funds will result in surcharge liability is more limited than the standard applied to trustees at common law, where negligence was sufficient for recovery.

### C. *The Officers' Claims*

#### 1. *Weekly Expense Allowances*

The officers received $100 a week as a fixed weekly expense allowance. They did not have to itemize or account for any expenditures actually incurred in order to obtain that amount. These allowances, established in 1971 by the National Office, were received in addition to expense accounts that included credit cards and charge accounts at hotels and air lines, and reimbursement for out-of-pocket expenditures, such as meals at restaurants, under a cash voucher system.

 The District Court found that all of the weekly allowances paid to the officers were used for their personal expenses and ordered all the allowances to be repaid. The defendants contend the evidence was insufficient to support this finding. We agree.

The District Court based its conclusion essentially on two factors: (1) Perry's testimony that frequently, when he paid for other officers' expenses, they would submit expense vouchers for those same amounts and (2) the existence of other expense accounts available to the officers. Yet Perry had left the Union in 1969, three years before the practice of paying the weekly allowances was instituted. While his testimony is probative of the officers' attitudes and behavior with respect to union funds after he left, it does not suffice to establish that all the weekly allowances were misused. Though there was no evidence of improprieties with respect to the numerous other expense accounts, the District Court concluded that the amounts reimbursed under these other accounts established that the weekly allowances were unnecessary and therefore were inevitably used for personal expenses. However, the other expense accounts were not used solely to reimburse the expenditures of the individual defendants. For instance, the major portion of the hotel charges represented payments for rooms used by members at national Union conventions. Moreover, the purpose of the weekly allowances was to pay the officers' local travel expenses because the Union had abandoned its prior practice of furnishing each officer with an automobile. None of the other expense accounts available to the officers reimbursed them for such expenditures.

Unlike Curran's travel expenses between Florida and New York, which, subject to accounting, may well be found to have been incurred solely to facilitate his preference for living in Florida, the weekly allowances included business-related driving to and from ports and Union headquarters on Union matters and driving from home to airports for Union business trips, in addition to ordinary commuting costs. Such travel expenses were within the scope of the "necessary expenditures" clause. The $100 per week allowance was a reasonable substitution for the prior practice of making automobiles available at Union expense.

In some instances an officer may have pocketed a portion of any given week's allowance, when his expenses did not consume the entire $100. But the issue is not whether some unexpended portion of the

allowances is income to the officers for income tax purposes, nor even whether some of the items covered by the allowance would not qualify as business deductions for tax purposes. The issue is whether this category of expenditures has been paid in violation of the fiduciary obligation of § 501. A plaintiff in a § 501 suit need not prove the impropriety of every expenditure within a challenged category, but he must provide sufficient evidence of abuses within the category to justify a detailed accounting. At that point the burden will be upon the defendants to prove the propriety of each expenditure. We disagree with the District Court that the plaintiffs offered sufficient evidence to support the ruling requiring repayment of the weekly allowances, or even to require an accounting of how these allowances were spent.

### 2. Foreign Travel

The District Court ordered an accounting of all foreign travel by the defendant-officers at Union expense since 1963, and restitution of any funds for trips not involving a Union purpose. The Court included travel financed by the Deep Sea Fund, the seaman's pension fund jointly administered by the Union and maritime employers. The order was based on two findings: (1) that three of the defendants had traveled to Europe with their wives at the Deep Sea Fund's expense for what the Court concluded was a trip for personal enjoyment and (2) that the Union's controller had traveled to Europe on Union funds for a trip of only personal benefit.

The officers challenge the propriety of an accounting of Deep Sea Fund expenditures, maintaining that those expenditures are not within the scope of § 501 because it applies only to "labor organizations." They rely first on a comparison of § 501 with the more specific language of § 502, the Act's bonding requirement, which refers to both labor organizations and jointly-managed trusts. They also cite dicta in two decisions of this Court to the effect that pension trusts are not to be equated with "a labor organization," *Morrissey I, supra,* 483 F.2d

at 484, and that § 501 is silent as to the federally-created duties of the trustees of jointly-managed pension funds, *Cuff v. Gleason,* 515 F.2d 127, 129 (2d Cir. 1975).

The more specific reference in § 502 was required because that section, unlike § 501, imposed liability on more individuals than union personnel. Clark, *supra,* at 476. With respect to the entities covered, the language of § 501 is certainly broad enough to include jointly-administered trusts, *cf. Hood v. Journeymen Barbers, Hairdressers, Cosmetologists and Proprietors International Union,* 454 F.2d 1347, 1354 (7th Cir. 1972) (discussing broad reach of § 501 beyond general Union funds). The only remarks in the legislative history bearing on the question support inclusion of these entities in the section's coverage. In discussing how § 501 would fulfill the objectives of the McClellan Committee, Congressman Barden quoted the Committee's recommendation that considered welfare funds, like union dues, to be funds held in trust for Union members. 105 Cong.Rec. 18,153 (1959); *see id.* at 17,903 (Sen. Goldwater) (same); Clark, *supra,* at 476–77 (discussing congressional debate and concluding jointly managed trusts included in § 501); Dugan, *supra,* at 293 (same). Moreover, both of our prior decisions in *Morrissey I* and *Cuff* involved the liability of *trustees* of such funds, a position that can include members of corporate management who clearly are not subject to the strictures of § 501. This case concerns the liability of union *officers* for receiving improper payments from those funds, individuals who do have fiduciary duties imposed by § 501. Section 501's purpose to prevent union officials from looting union treasuries would be frustrated if it did not include breaches with respect to pension funds, whose assets belong to union members, for then officers could avoid liability for wrongful gains simply by manipulating the source of a personally beneficial transaction. The defendants in this case have breached their duty to the membership not in their capacity as pension fund trustees, *i. e.,* in deciding to make the payments, but in their capacity as union officers receiving them. We conclude that

the broad statutory language and glimmerings of legislative intent confirm the District Court's conclusion that § 501 fiduciary obligations apply to the Deep Sea Fund expenditures.

We also agree with the District Court that the evidence of wrongful use of funds for foreign travel was sufficient to justify an accounting. The evidence fully supported the finding of no business purpose for a European trip by the Union's controller paid for out of Union funds. The evidence as to a European trip paid for by the Deep Sea Fund was somewhat more equivocal. The District Court was understandably skeptical that discussions with pensioners living abroad was really the purpose of an extensive trip by a group of officers and their wives. On the other hand, undisputed evidence showed that the wives' expenses were not paid for by the fund, and some evidence was presented of meetings between the officers and pensioners. In light of all the evidence, an accounting of the officers' foreign travel is appropriate to permit a focused inquiry on the details of this category of expense. Upon such examination, the officers may persuade the Court that most, possibly all, of their travel was bona fide. Ultimate determination of the business nature of each trip will depend on whether the trip was undertaken to serve some legitimate business purpose of the Union or the Fund, even though foreign travel may not have been the only means for accomplishing such purpose.

### 3. *The Staff Pension Plan*

The District Court ordered the Union to revise its Staff Pension Plan on a finding that the plan yielded unreasonable and excessive benefits. The Court specified three necessary changes: reducing the maximum years-of-service ceiling, to which the level of benefits is pegged, from 40 to 35 years; raising the discount rate applied in determining the lump-sum pension payments from 6½% to the highest available current yield;[16] and requiring the same maximum amount of severance pay for all employees by eliminating a "grandfather clause" exception to the new severance pay plan, which establishes a one-year maximum benefit.

The District Court found the plan unreasonable because the combined package of pension benefits and severance pay could provide retirement income exceeding the retiree's highest salary while working, if benefits received in a lump-sum payment were reinvested at current interest rates. The Court rejected the severance pay "grandfather clause" for evidencing favoritism to Wall, because Wall, along with only two other employees, came within the exemption, and he was the only defendant who did not retire during the course of this lawsuit and take advantage of the prior plan's more generous benefits. All of the Court-ordered revisions are challenged on appeal.[17]

16. The Fund first used a 3% rate, which was raised at some point to 4½%. In 1976, the discount rate was raised to the current 6½% in order to comply with federal requirements under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1976).

17. The District Court's direction that the Union revise its pension plan raises a question of appealability under this Court's decision in *Taylor v. Board of Education*, 288 F.2d 600 (2d Cir. 1961), where we held nonappealable a direction to formulate a school desegregation plan. But in *Spates v. Manson*, 619 F.2d 204 (2d Cir. 1980), we reaffirmed two exceptions to *Taylor*, both of which are applicable in this case. *Taylor* does not apply where the content of the plan to be submitted is specified by the court, or where the court grants, in addition to

the order to submit a plan, other injunctive relief that is not distinct from the subject matter of the plan and consequently should not be considered separately. *Id.* at 209. In this case, the District Court specified the appropriate number of years of service and discount rate for accelerated payments for an acceptable Union pension plan, as well as the permissible maximum severance pay amount. This content-prescription satisfies the *Taylor* exception for specificity. Moreover, the Court enjoined all payments under the lump-sum and accelerated payment options of the pension plan until a revised plan is submitted. This order constitutes "other injunctive relief," not sufficiently distinct from the plan's revision, because its sole purpose is to protect the corpus of the pension fund, should the revised plan alter ben-

As we have previously discussed, we agree with the District Court that it could review the reasonableness of the pension plan despite its valid authorization by the Union membership. But we disagree with its assessment of the reasonableness of the plan. There is no basis for rejecting a pre-tax pension benefit as excessive under § 501(a) when it does not exceed the employee's highest pre-tax wages.[18] Nor does a violation of § 501(a) result from the fact that a pensioner's low tax bracket may cause his after-tax pension benefit to exceed his after-tax wages. We agree with the District Court that a plan's use of an overly generous discount rate for determining the lump-sum value of annuity payments could render a benefit excessive, but the National Maritime Union's pension plan was not shown to be manifestly unreasonable in its benefits. Judicial intervention might be authorized if the discount rate were set so low that the resulting lump-sum benefits could be placed in a risk-free investment and produce a pre-tax return higher than pre-tax wages.

Similarly, we find that the ordered revision of the severance pay plan was unsupported by the evidence. Wall and the two employees who were exempted from the one-year severance pay maximum of the new plan had worked for the Union for 25 years, and the exemption simply permitted them to retain the larger severance pay sum they understood they had already earned under the previous plan. We find those circumstances render the "grandfather clause" of the severance pay plan reasonable. Although we agree with the District Court that the defendants' early retirements during the course of this litigation, reflecting efforts to obtain as much money as they could from the Union's meager coffers, were hardly commendable, the terms of the plans do not establish a breach of the fiduciary obligations imposed by § 501(a).

### D. Perry's Claim

Morrissey had challenged the propriety of the Union's signing in 1966 a contract with Perry that required the Union to pay Perry's salary through 1974, even if his employment was terminated, which had in fact occurred in 1969. At the close of Morrissey's case, on May 19, 1977, the District Court dismissed all the charges against Perry. Two years later, in an opinion filed July 27, 1979, the Court held Perry liable for approximately $15,000 of pay in lieu of vacation received allegedly for the years he was paid after his discharge under his long-term employment contract. The Court held that during those years, since Perry was not employed by the Union, he could not have sacrificed vacation time and worked instead, and was therefore not entitled to the pay. According to the record, the Court became aware of Perry's liability during the presentation of defendants' case, but it did not try to notify Perry, or join him as a party to present a defense, at that time.

When he received notice of the judgment against him, Perry, who had defended himself, protested against the Court's finding him liable because he had not been a party to the proceedings for two years. The Court indicated by letter that it would reopen the trial if Perry had any evidence to introduce that would prove he was entitled to the payments. Perry then sought to reopen the trial, claiming that he would testify that the payments were received for

---

efit rates of recipients who choose one of the accelerated payment schedules. Because the Court's order that the Union submit a new pension plan comes within the two exceptions to *Taylor*, we conclude that it is appealable. The National Maritime Union Staff Pension Plan has joined in the appeal of this order as a post-judgment intervenor.

**18.** If a pension benefit were subject to cost-of-living adjustments, the relevant comparison would be between the adjusted benefit and the then current wage. If, as would normally be expected, the pension benefit is not subject to cost-of-living adjustments, we do not mean to imply that fiduciary obligations would be breached by authorizing a pre-tax pension benefit somewhat above pre-tax wages, to assure the pensioner purchasing power over his retirement years equal to the purchasing power of those who remain working and who can be expected to receive cost-of-living wage increases.

past vacations he had forgone while employed and not for vacations after his discharge. The Court denied the motion on the grounds that the proffer of such testimony was contradicted by the documentary evidence introduced at trial, which the Court interpreted as showing that the pay in lieu of vacation had been calculated automatically solely according to the number of years remaining on Perry's contract.

Perry contends on appeal that the District Court failed to accord him due process of law. Although the Court's response indicating it would reopen the trial if Perry could produce adequate evidence avoided an otherwise clear violation of Perry's due process rights, *see Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950), we think that the circumstances required the Court to hold an evidentiary hearing when Perry offered to testify personally concerning the payments. At oral argument before this Court, Perry stated that in addition to his own testimony, a witness, now deceased, Abraham Freedman, would have said that Perry was paid for past services; as former General Counsel to the Union, Freedman had to approve those expenditures. While Perry's oral testimony regarding these matters may prove insufficient to controvert Morrissey's documentary evidence, *see United States ex rel. Brennan v. Fay*, 353 F.2d 56, 59 (2d Cir. 1965), the Court should not have refused to reopen the case simply because Perry offered verbal evidence. The Court should hear his testimony and make a credibility finding. *Cf. United States v. Ross*, 251 F.Supp. 175, 184 (S.D.N.Y.), *aff'd*, 368 F.2d 455, 458 (2d Cir. 1966) (after considering both exhibits and oral testimony court accorded greater weight to documentary evidence on finding witness's credibility open to serious question). If any prejudice arose from a lost opportunity to present Freedman's testimony, that should also be considered.

The judgment of the District Court is affirmed with respect to Morrissey's claims, affirmed in part and reversed in part with respect to Curran's claims and the claims of the other defendant officers, vacated as to Perry's claim, and remanded for further proceedings in accordance with this opinion. No costs.