Opinion for the Court filed PER CURIAM.
Separate opinion concurring in part and dissenting in part filed by Circuit Judge KAVANAUGH.
Separate opinion concurring in part and dissenting in part filed by Senior Circuit Judge WILLIAMS.
PER CURIAM:
David W. Noble, Jr., is a member and former employee of the National Association of Letter Carriers (“NALC” or the “union”). In 1994 he brought suit against Vincent R. Sombrotto, then president of the union, as well as eleven other union officers, accusing them of violating them fiduciary duties under § 501(a) of the Labor-Management Reporting and Disclosure Act (“LMRDA”), 29 U.S.C. § 401 et seq. He later joined the union itself as an additional defendant.
Noble alleged that the officers had directed union funds to their personal benefit in three ways: (1) an unmonitored “in-town” expense allowance; (2) union reimbursement of the employee portion of the officers’ Federal Insurance Contributions Act (“FICA”) taxes; and (3) unnecessary “per diem” payments made during the union’s biennial National Conventions. By way of relief, he sought an accounting from the officers and the recovery by the union of all unlawful expenditures. He also sought the release of certain financial documents under § 201(c) of the LMRDA, 29 U.S.C. § 431(c).
After a bench trial, the district court dismissed all of Noble’s claims. Noble v. Sombrotto, No. 94-302, slip op., 2006 WL 2708796 (D.D.C. Sept. 20, 2006). The court held that the various payments to the officers had been properly authorized under the union’s constitution and internal procedures, and therefore could not have violated § 501(a). Id. at 15-19. It also dismissed Noble’s § 201(c) claim as moot. Id. at 20-21.
We reverse the district court’s judgment as to the expense allowance program and vacate its dismissal of Noble’s § 501(a) claim on this issue. We affirm the district court’s dismissal of Noble’s § 501(a) claims on the FICA reimbursements and the per diem payments. Finally, because we cannot identify the factual basis for the district court’s mootness finding, we vacate its dismissal of his § 201(c) claim.
I. Background
In 1959, Congress passed the Landrum-Griffin Act, also known as the Labor-Management Reporting and Disclosure Act (“LMRDA”) to protect against misuse of *1233 union funds by corrupt union officials. See, e.g., Tile, Marble, etc. v. Ceramic Tile Finishers Union Local 25, 972 F.2d 738 (7th Cir.1992). LMRDA’s § 501(a) makes union officers fiduciaries of union funds and commands that they keep and use those funds solely for the benefit of the organization and its members. It also forbids unions from adopting provisions or resolutions purporting to absolve union officials for breaches of these duties. LMRDA’s § 501(b) gives union members a private right of action to sue officers in breach of their fiduciary duties in federal or state court to recover damages on behalf of the labor organization. LMRDA’s § 201(c) requires unions to make available to their members all information the organizations are required to file with the Secretary of Labor. That section also provides a private cause of action by which members may compel the union to allow them to inspect records necessary for the members to verify the accuracy of a union’s report.
The National Association of Letter Carriers (“NALC” or the “union”) is a labor union that represents approximately 300,-000 active and retired letter carriers of the U.S. Postal Service. NALC is governed by a constitution which may be amended by majority vote of its biennial National Convention. NALC’s constitution provides for the union to be administered by an Executive Council, whose power is secondary only to that of the National Convention, and gives the council authority to “act between Conventions on all matters related to the welfare of the Union not specifically prohibited by the membership.” NALC Const, art. 9, § 11(e) (1992) (The relevant sections of the constitution have been renumbered over time; for the sake of convenience we use the 1992 numbering throughout unless noted otherwise.). The Executive Council is made up of 28 union officers, including 10 “Resident Officers” (including the President), 15 “National Business Agents,” and 3 “Trustees.” The Executive Council has explicit authority to act between Conventions to “authorize and/or ratify the payment of salaries, wages, expenses, allowances, and other disbursements which it deems necessary and appropriate to the purpose and functioning of this Union, other than provided for.” Id. § 11(e)(3).
Following the 1992 National Convention, appellant David W. Noble, Jr., then a union employee as well as a longtime union member, became aware of various union expenditures authorized by the Executive Council that redounded to its members’ personal benefit. Conducting his own investigation, Noble determined that union officials had longstanding practices of taking $500 monthly expense allowances without providing any supporting documentation justifying such payments; that NALC officers were accepting per diem during meetings of the National Convention even if they incurred no personal expenses; and that the council had decided to reimburse their members for their share of Social Security and Medicare taxes withheld from their NALC paychecks. Noble also found records from past conventions revealing that union officials who had been challenged by union members on some of these practices had given misleading responses, leaving union members under the incorrect impression that the accusations were inaccurate.
Noble filed internal charges against the NALC officers on August 16, 1993, by hand-delivering his accusations to union president Vincent Sombrotto. Sombrotto immediately suspended Noble from his job without pay, after which Noble returned from his long-term leave from the U.S. Postal Service to work as a letter carrier. In accordance with the NALC constitution, Sombrotto called for a five-member investigating committee to investigate Noble’s *1234 charges and report to a special meeting of the NALC convention. The investigating committee, constituted of NALC members who were not members of the Executive Council, rejected Noble’s attempts to participate in the investigation by attending investigatory meetings and calling witnesses, and denied his request to receive a copy of its report in advance of the special convention. After conducting its investigation, which confirmed that Noble’s complaints were based in fact, the investigating committee presented its findings to the special convention on October 13, 1993.
At the meeting, the investigating committee reported that the $500 monthly “in-town” expense allowance was a longstanding practice dating to the 1950s. Similarly, it reported that officers’ receipt of per diem during convention weeks was both longstanding and justified by a ban on reimbursement for other expenses incurred during that period. The committee also found that NALC was reimbursing officers and staff for their share of Social Security taxes because those members were simultaneously required to pay into the Civil Service Retirement System (“CSRS”). Delegates to the special convention roundly rejected each of Noble’s charges of wrongdoing by an average margin of 25 to 1.
On February 17, 1994, Noble filed suit against Sombrotto and eleven other NALC officers alleging that they had breached their fiduciary duties to the union in violation of 29 U.S.C. § 501(a) by (1) authorizing a monthly “in-town” expense allowance without requiring that expenses be documented; (2) authorizing union reimbursement for the officers’ employee portion of their FICA taxes; and (3) collecting per diem payments far in excess of their actual expenses during NALC’s biennial National Conventions. Noble sought recovery of all unlawful expenditures from the officers named in his complaint on behalf of the union. Further, Noble brought a claim under LMRDA § 201(c), alleging that he had been denied financial documentation necessary to verify NALC’s annual financial reports.
During the subsequent regular National Convention in 1994, NALC membership rejected proposed amendments that would have (1) limited per diem payments to full-time officers during convention weeks, (2) limited the Executive Council’s power to authorize salaries and benefits for elected officers, and (3) would have governed future instances when all members of the Executive Council were charged simultaneously. During the 1996 convention, proposed amendments to limit the Executive Council’s authority to set wages and benefits and limit their receipt of per diem payments during conventions met the same fate. The 1996 National Convention, however, passed a resolution that approved and confirmed the constitutionality of the $500 “in-town” expense allowance for NALC officers, payment of officers’ half of FICA taxes, and payment of per diem to officers during National Convention meetings at the same rate as that paid to other delegates. This resolution received 88% of the nearly 4,500 votes cast.
The district court held a bench trial on Noble’s claims on April 13 and 14, 2004. On September 30, 2005, the court issued a memorandum opinion and order dismissing Noble’s case with prejudice. Noble subsequently filed a motion to alter or amend the district court’s judgment, but the district court denied Noble’s motion and on September 20, 2006, issued its final opinion and order entering judgment in favor of the union officials. Noble, slip op. at 20-21. Noble appeals the district court’s dismissal of his three claims under LMRDA § 501(a) and his § 201(c) claim.
*1235 II. Standard of Review
Our decision in Monzillo v. Biller, 735 F.2d 1456 (D.C.Cir.1984), requires that we defer to “an interpretation of a union constitution rendered by officials of a labor organization ... unless the court finds the interpretation was unreasonable or made in bad faith.” Id. at 1458.[1] We give even greater deference to the union officials’ interpretation when, as here, a union convention has approved the officers’ interpretation of the union constitution because such approval “undermines a finding that the [officers’] interpretation was unreasonable and made in bad faith.” Id. at 1464. We review de novo the district court’s conclusion that the union officials’ interpretation of the constitution was reasonable, and we exercise clearly erroneous review over the district court’s factual findings.
III. In-Town Expense Allowance
Noble’s first challenge is to the dismissal of his claim that appellees violated LMRDA § 501(a) by authorizing an “expense allowance” for NALC’s Resident Officers. The Executive Council passed resolutions authorizing these payments in 1975, 1977, and 1980, pursuant to its authority under NALC Const, art. 9, § 11(e)(3), to cover the expenses NALC officers residing in Washington, D.C. incurred in the performance of their official duties. The 1980 resolution noted that these officials were expected to incur “transportation, entertainment, and other expenses for the benefit of the [union] in the Washington, D.C. Metropolitan Area,” and it allowed them to draw “up to $500.00 each month as an allowance for official in-town expenses.” Resident Officers and Staff In-Town Expense Allowance Resolution (Dec. 8, 1980). Sombrotto, as president, was reimbursed for “all official expenditures made by him, both in town and out of town.” To claim their allowance for a month’s expenses, the officers did not need to submit itemized receipts. Instead, the resolution deemed any request for reimbursement as itself a representation that “the sum requested was expended on behalf of [NALC] in the course of performance of official duties.” The resolution did, however, require officers to personally keep their receipts for a “reasonable period” of up to five years. NALC reported all reimbursements not documented by receipts as part of the officers’ taxable income. Noble, slip op. at 5.
Noble argues that the officers’ participation in the expense allowance program violated their duty under 29 U.S.C. § 501(a) to manage union funds “in accordance with [the union’s] constitution and bylaws.” Executive Council members receive salaries that are specified in the NALC constitution and thus beyond the council’s power to control, NALC Const, art. 9, §§ 1-10, and Article 6 provides that “[i]n addition to their salaries, all elected officers [i.e., Executive Council members] shall be entitled to reimbursement of all itemized expenses legitimately incurred in conduct of the affairs of the Union.” Id. art. 6, § 1. Additionally, Article 11 makes it the duty of a three-member Fiscal Committee to “examine all bills submitted for payment and, if found to be correct, to approve them and authorize payment to be made,” noting that “[a]ll bills shall be itemized.” Id. art. 11, § 2(b). On this basis, Noble argues that the Executive Council had no authority to relax the constitution’s itemization and documentation requirements. The district court disagreed, find *1236 ing as reasonable the Executive Council’s interpretation of Article 9, § 11(e) and (e)(3) as authorizing the expenditures, and buttressing this conclusion by observing that Noble had presented no evidence “that the in-town expense allowance was utilized by Resident Officers for purely personal reasons, unrelated to union business.” Noble, slip op. at 17.
While we agree with the district court’s finding that the NALC constitution was ambiguous on this point, id. at 16, we must reverse the court’s dismissal of Noble’s claim on this issue because a key factual finding underlying its conclusion that the interpretation was reasonable was clearly erroneous. Though NALC Const, art. 6, § 1 expressly entitles all elected union officers to obtain reimbursement of itemized expenses, that minimum entitlement does not unambiguously prohibit the council from providing additional payment for expenses or allowances. Neither Article 6, § 1 nor Article 11, § 2(b) unambiguously requires a contrary interpretation. Thus, it was not improper for the district court to use Monzillo’s more deferential standard of review in evaluating the reasonableness of the NALC Executive Council’s interpretation of their authority to authorize the expenses.
Nonetheless, in finding the Executive Council’s repeated authorization of the “in-town” expense allowance reasonable, the district court relied on a clearly erroneous factual finding: that Noble produced “[n]o evidence” that officers had used the allowance for “purely personal reasons, unrelated to union business.” Noble, slip op. at 17. To the contrary, Noble presented ample circumstantial evidence that officers were using the allowance for personal use. The officers had a direct financial incentive to keep receipts for all union-related expenses because any difference between their documented expenses and the $500 per month allowance amount was reported as taxable income. Thus, each officer could easily have avoided a substantial additional tax liability by keeping and submitting receipts for legitimate union-related expenses he or she incurred each month. Additionally, the 1980 Executive Council resolution authorizing the challenged allowance specifically charged each officer with retaining receipts for all expenses incurred and to keep them for a “reasonable period” of up to five years. The fact that the vast majority of allowances paid to Executive Council members during the pertinent period were not supported by receipts is thus considerable circumstantial evidence suggesting that much of this money went to officers’ personal use.
The district court may have been under the misapprehension that proof of personal use may only be made by direct evidence. Under circumstances closely analogous to those before us, the Second Circuit did imply a requirement of direct proof for such an allegation in Morrissey v. Curran, 650 F.2d 1267, 1283-84 (2d Cir.1981). There, the Second Circuit rejected for insufficient evidence a district court’s finding “that all of the weekly allowances paid to the officers were used for their personal expenses” supported by the fact that the officers lacked receipts showing the expenses were made for union business. Id. Though Morrissey is unclear on whether those union officers were under an obligation to retain receipts as the NALC officers were here, if the Second Circuit has indeed adopted a requirement that allegations of personal use are susceptible of proof only by direct evidence, then we must part ways with our sister circuit on this point. A union member complaining of personal use of union funds by its officers will hardly ever be able to put on direct proof of such use unless an officer confesses to such. Here, Noble presented about as much evidence as one could hope *1237 a § 501 plaintiff could gather — that the union had disbursed far more funds for purportedly union-related expenses than officers responsible for the payments could account for. On remand, the district court must reach the issue of how the union’s money was actually used, weighing Noble’s circumstantial evidence of misuse against any evidence the officers present to the contrary.
We note as well that the district court’s memorandum opinion made no mention of Noble’s evidence of bad faith regarding the “in-town” expense allowance. The evidence Noble presented showing that NALC presidents twice misleadingly denied the allowance’s existence when challenged on the issue at National Conventions is troubling. While the district court need not specifically reference all contrary evidence in its factual findings, see Schilling v. Schwitzer-Cummins Co., 142 F.2d 82 (D.C.Cir.1944), some mention of this evidence would have been welcome here. On remand, we would refer the district court to our decision in United States v. DeFries, 129 F.3d 1293 (D.C.Cir.1997), which suggests that courts should closely scrutinize self-serving courses of conduct when union officers conceal vital information from union members. See id. at 1307 (holding that when union executive committee concealed information on challenged severance payments from its members, it was not “reasonable to say that the severance payments were ‘authorized’ ” despite union bylaws expressly empowering the executive committee to set its own compensation).
Finally, two of the appellees purport to be outside the scope of § 501 for the purposes of this claim. William M. Dunn, Jr., and Robert W. Vineenzi received their expense allowances and FICA reimbursements not from NALC itself, but from other corporate entities affiliated with NALC (the Mutual Benefit Association and the Health Benefit Plan, respectively). The officers argue that Dunn and Vineenzi cannot be held liable under § 501(a), which concerns only the use of union funds, and that as to them we should affirm the judgment on this alternative ground regardless of our resolution as to the other defendants. The district court found that the Mutual Benefit Association and the NALC Health Benefit Plan were “separate and distinct” from NALC. Slip. op. at 13-14. Noble does not appeal this finding, which makes it conclusive on remand. See, e.g., Kimberlin v. Quinlan, 199 F.3d 496, 500 (D.C.Cir.1999). But because the district court neither explained the scope of its factual finding nor drew from it any legal conclusions, and because the degree of separation necessary to avoid § 501’s application is itself uncertain, compare Yager v. Carey, 910 F.Supp. 704, 728 (D.D.C.1995), with Morrissey, 650 F.2d at 1284, and Hood v. Journeymen Barbers Int’l Union, 454 F.2d 1347, 1351-54 (7th Cir.1972), no final determination of this special defense is appropriate at this time. The district court should resolve this issue on remand.
IV. Reimbursement of FICA Payroll Taxes
Noble’s second challenge is to the union’s reimbursement of the officers’ FICA payroll taxes. In December 1980, the Executive Council decided to reimburse all full-time officers and staff for each employee’s share of FICA taxes, which is comprised of an employee’s mandatory Social Security and Medicare contributions. The Council made this expenditure under the authority of NALC Const, art. 9, § 11(e)(4) (1980), which authorized the council to “establish such benefits as may be required to attract and retain competent personnel, including but not limited to annuity, welfare, vacations, holidays, severance pay, tuition or scholar *1238 ship, and insurance benefits.” The council took this action because all union staff and officers, even while working away from them letter carrier positions with the U.S. Postal Service, were required to pay a fixed percentage of their income into CSRS. CSRS-covered employees did not then contribute into, nor were covered by, Social Security. By law, Social Security retirement benefits are only payable to those who have paid a minimum amount into the system for at least ten years. See 42 U.S.C. § 414. Thus, when letter carriers took full-time positions with the NALC, they found themselves compelled to pay into two different retirement systems — one of which, unless they remained in NALC’s employ for ten years or had held another job that paid into Social Security, might never provide them any benefits.
The district court found that Article 9, § 11(e)(4) provided the Executive Council with authority to make this reimbursement an employment benefit, reasoning that the move satisfied that constitutional provision’s intent of attracting and retaining competent personnel by “lessen[ing] the financial burden on individuals who chose to hold appointed or elected position within NALC.” Noble, slip op. at 17-18. Here, as below, Noble challenges this reimbursement as a violation of NALC’s constitution, which fixes the salaries that each Executive Council member receives.
We cannot say that the Executive Council’s “interpretation conflicted with the stark and unambiguous language of the constitution.” Loretangeli, 853 F.2d at 194-95. Because the Executive Council’s interpretation of the constitution permitting the FICA tax reimbursement as a benefit under Article 9, § 11(e)(4) was neither unreasonable nor made in bad faith, the district court properly deferred to that interpretation. Where, as here, the union constitution explicitly incorporates policy concerns into the Board’s grant of authority by directing the Board to establish benefits as “required to attract and retain competent personnel,” a given benefit’s wisdom as a policy matter is germane to the Board’s constitutional authority to authorize it. We see no reason to disturb the district court’s dismissal of this claim.
V. Per Diem Expenses During National Conventions
Noble’s remaining § 501(a) claim concerns the payment of “per diem” allowances to Executive Council members during meetings of the biennial National Convention. NALC provides daily expense allowances to a small group of attendees at the Conventions to cover lost wages, hotel rooms, meals, and incidentals. (In 2002, for example, the allowance was $420 per day, based on $166.93 for lost time, $158.48 for hotels, and $94.59 for meals and incidentals.) The officers Noble named in this suit attended every Convention ex oficio and received per diem payments despite the fact that they lost no wages by attending and frequently stayed in free or reduced-rate rooms at the hotels hosting the Conventions. Noble alleges that the officers’ acceptance of these per diems violated § 501 because they took union funds as “reimbursements” for expenses they did not actually incur. Noble further alleges that Convention delegates were misled as to the nature of the payments and that the officers gained Convention approval of their per diem payments without adequate disclosure.
The NALC Const, art. 13, § 2 provides that “[p]er diem shall be paid to each officer as the National Association, while in session, may direct” and Article 11, § 6 directs that “[t]he Committee on Mileage and Per Diem shall compute and report to the National Convention the name, residence, and amount due each member eligi *1239 ble for mileage and per diem.” The district court found that in 1964 a majority of Convention delegates voted to dispense with the reading of the individual payees and substituted a procedure by which the Mileage and Per Diem Committee provided the Convention a summary report of the total per diem allowance per eligible delegate for each day. Noble, slip op. at 19. The district court found that this practice had continued ever since. Id.
While we take no view on the propriety of per diem payments made to delegates other than Executive Council members which were approved by this summarized procedure, we do not find the Executive Council members’ acceptance of payments in this way to be clearly contrary to NALC’s constitution. Reading Article 11, § 6 as clearly and unambiguously prohibiting payments of per diem to Executive Council members during the Convention without their names and payment amounts having been read aloud to Convention delegates would flatly conflict with Article 13, § 2. The 1980 and 1992 versions of NALC’s constitution explicitly state at Article 13, § 2 that “[p]er diem shall be paid to each officer as the National Association, while in session, may direct.” The 1992 NALC constitution lists as “officers” all 28 members of the Executive Council — and no one else. Thus, Article 13, § 2 appears to direct per diem payments to the very group Noble accuses of having violated § 501 by accepting them. We certainly cannot say that NALC’s constitution unambiguously forbade them from receiving per diem if them names and addresses were not read aloud.
Thus, NALC officials’ interpretation of them constitution as authorizing their acceptance of per diem payments via this summarized approval procedure is owed deference unless shown unreasonable or in bad faith. In determining reasonableness, a district court may consider the union’s consistent past practices, see Conley v. Parton, 116 L.R.R.M. (BNA) 3071, 3075-76 (N.D.Ind.1984). We agree with the district court that the Executive Council’s reliance on past practice and a plain language reading of other provisions in NALC’s constitution as authorizing per diem payments to Executive Council members without having read their names aloud to the Convention was reasonable and entitled to deference.
We further find no merit to Noble’s argument that Convention delegates were “misled” about the nature of payments or uninformed that the officers would receive full per diem payments. The total per diem was a set figure and Noble concedes that, even under the streamlined procedure followed through 1992, the Convention was informed of the total per diem amount determined by the Mileage and Per Diem Committee. Combining that information with a basic reading of NALC’s constitution would alert delegates that Executive Council officers were receiving those sums, even if no names were read aloud to the Convention delegates. Thus, we cannot say that the district court erred by finding both the summarized procedure and the officers’ acceptance of per diem payments during Convention meetings neither unreasonable nor in bad faith.
VI. President Sombrotto’s Failure To Report
While it is unclear in his brief, Noble may have attempted to renew an argument he made below that President Sombrotto personally violated § 501(a) by failing to report his official actions to the biennial Convention in accordance with NALC Const, art. 9, § l(k). In the district court, Noble specifically complained that Sombrotto should have reported his approval of the Executive Council resolutions authorizing the in-town expense al *1240 lowance and FICA reimbursements to the Convention. The district court found that:
[Although Art. 9, § l(k) requires that the President “shall submit at each Convention a written report of all his/her official acts during his/her term of office,” the Executive Council resolutions at issue in this case were official acts of the Executive Council, not the President. Therefore, NALC’s interpretation of its Constitution that it does not require such reporting of resolutions is reasonable.
Noble, slip op. at 21-22. We agree with the district court’s reasoning and affirm its dismissal of this claim.
VII. Noble’s “Manifest Unreasonableness”
Argument
Noble argues that even if the in-town expense allowances, FICA reimbursements, and per diem payments were fully authorized, the officers violated their fiduciary duties under § 501(a) by personally enriching themselves with union funds. Noble urges this Court to adopt the Second Circuit’s approach, such that “where a union officer personally benefits from union funds, a court in a § 501(b) suit may determine whether the payment, notwithstanding its authorization, is so manifestly unreasonable as to evidence a breach of the fiduciary obligation imposed by § 501(a).” Morrissey, 650 F.2d at 1274. The defendants ask us to reject the Second Circuit’s standard, quoting legislative history of the LMRDA to the effect that compliance with the constitution means that the officers did not breach their duties.
We have not yet given precise content to § 501’s fiduciary duties, cf. Mallick v. Int'l Bhd. of Elec. Workers, 749 F.2d 771, 780-81 (D.C.Cir.1984), nor have the parties exhausted the possible tests that could be employed — or even those proposed by the Second Circuit, see Morrissey, 650 F.2d at 1274-75 (suggesting that courts apply “judicial scrutiny of the reasonableness and fairness of the transaction ... at least as rigorous as that undertaken when the fiduciary is a corporate director who has an interest in the challenged transaction”). But we need not decide these questions here. Noble relies solely on his proposed “manifestly unreasonable” standard, which as he presents it, imposes liability on union officers when they approve their receipt of excessive benefits, significantly above a fair range of reasonableness. Noble Br. 30 (emphasis added) (quoting Morrissey, 650 F.2d at 1275); see also Noble Reply Br. 16 & n. 4 (contesting the reasonableness of the amounts involved). As to the FICA reimbursements and the per diem payments, however, Noble has failed to show that the payments were outside the kinds and amounts of payments that are generally reasonable in the ordinary course of union officers’ activities. They represented at most a small percentage increase in the total compensation of the officers, which was not itself excessive. Thus the payments, if authorized, did not violate § 501 on Noble’s own theory. (Noble suggests obscurely that § 501 may impose broader limitations on self-dealing without respect to amount, a possibility he does not develop in any detail and on which we express no opinion.)
As to the in-town expense allowances, the district court will resolve on remand whether the officers used any portion of the allowances for their personal benefit rather than on legitimate union expenses. If so, it would be unnecessary for us to decide whether their actions also violated other duties under § 501. If not, then the officers received no personal benefit that we could review for manifest unreasonableness. The outcome of the remand will moot the issue either way.
*1241 VIII. Claim for Release of Documents Under § 201(c)
Finally, Noble brings a claim under § 201(c) for the release of documents relevant to verifying the union’s annual financial reports. The district court dismissed this claim as moot, stating that “[d]uring the course of this case, plaintiff has been given access to all of the pertinent NALC records. Further, he no longer contends that he is being denied access to any documents necessary to verify an annual financial report. Therefore, this claim is moot and is dismissed.” Noble, slip op. at 20-21. Noble contends that the factual findings underlying this ruling are clearly erroneous.
A case is moot if the judgment, regardless of which way it goes, “will neither presently affect the parties’ rights nor have a more-than-speculative chance of affecting them in the future.” Pharmachemie B.V. v. Bwt Labs., Inc., 276 F.3d 627, 631 (D.C.Cir.2002) (quoting Clarke v. United States, 915 F.2d 699, 700-01 (D.C.Cir. 1990)). By contrast, a holding that the plaintiff lacks legal entitlement to his requested relief is plainly a resolution of the merits. See In re Papandreou, 139 F.3d 247, 255 (D.C.Cir.1998). Because the district court characterized its holding as resting on mootness alone, we read the opinion as stating that Noble has been given everything he asked for and can be offered no further relief — not that his requests are unfulfilled but meritless.
While the district court had previously identified “genuine issues of material fact regarding which documents were requested by plaintiff as well as what responsive documents were provided,” Noble v. Sombrotto, 260 F.Supp.2d 132, 146 (D.D.C.2003), the record does not reveal any basis for its later finding that Noble’s requests had been fulfilled. The court did note in its findings of fact that Noble had made document requests in a letter to Sombrotto, that the union had contested his right to access but “nonetheless[ ] made available to plaintiff copies of NALC records relevant to his charges,” and that Noble “inspected documents on October 7, 1993.” Noble, slip op. at 9. But the source the court cites for the proposition that the defendants made copies available — Letter from Vincent R. Sombrotto to David W. Noble, Jr. (Aug. 31, 1993), Defs’ Ex. 7— makes clear that even the defendants did not claim to have provided everything Noble sought. Thus there is no indication whether NALC made available to Noble the many documents whose relevance was contested between them, which is what a finding of mootness requires. Nor is it clear which documents Noble was able to review on October 7, 1993.
Noble did contend before the district court that he had been denied documents that were relevant to verifying the union’s annual reports, PL’s Am. Proposed Findings of Fact 30, 42, and he alleged a variety of document requests made to NALC, not all of which had been fulfilled, id. at 29 & nn. 103-04, 30 & n. 105; see also PL’s Exs. 28, 31. In a supplemental filing to this Court, Noble identified nine categories of documents listed in a September 14, 1993 request which he claims never to have received from the union, including records from a union bank account in Minneapolis.
The defendants reply that NALC “produced thousands of pages of financial and other documents to plaintiff,” Sombrotto Supplemental Resp. 4, but they do not claim that Noble has received the particular documents he has identified, such as the Minneapolis bank records. Instead, the defendants argue two propositions unrelated to mootness: (1) that Noble failed to establish just cause to obtain the documents, which is a necessary element of a § 201(c) claim; and (2) that Noble forfeit *1242 ed his claim to any further documents by failing to request them properly in the course of discovery on his § 501(a) claims.
Because we cannot identify the factual basis for the district court’s mootness determination, we cannot affirm it, even under the deferential standard of clear error. Cf 19 Moore’s Federal Practice-Civil § 206.03[6]. Moreover, because the district court has passed on neither the merits of Noble’s claim nor the forfeiture issue, we decline to reach these alternative grounds. Rather, we vacate the dismissal of Noble’s § 201(c) claim and leave these questions, as well as the factual determination of what (if any) records Noble has requested but not yet received, to be resolved on remand.
IX. Conclusion
For the aforementioned reasons, we affirm the judgment as to the FICA reimbursements, per diem payments, and President Sombrotto’s non-disclosure but reverse the judgment as to the in-town expense allowances and as to the § 201(c) claim and vacate the dismissal of each. The case is remanded for further proceedings.

So ordered.

. An interpretation that conflicts with the "stark and unambiguous language” of the union's constitution is ordinarily unreasonable. Loretangeli v. Critelli, 853 F.2d 186, 194-95 (3d Cir.1988). Conversely, an interpretation that accords with the plain language of the union constitution is ordinarily reasonable.